Joseph M. Mabe, OSB No. 045286
Email: joe@sapientlaw.com
Neal S. Shechter, OSB No. 185119
Email:  neal@sapientlaw.com
Keith A. Pitt, OSB No. 973725
Email: keith@sapientlaw.com
SAPIENT LAW
425 NW 10th Avenue, Ste 200
Portland, OR  97209
Phone: 503.417.7777

*Of Attorneys for Plaintiffs Baek Family Partnership, LLC, AB Hollywood, LLC, MY, LLC, and The Penney Kim Trust on behalf of themselves and all others similarly situated*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| BAEK FAMILY PARTNERSHIP, LLC, an Oregon limited liability company, AB HOLLYWOOD, LLC, an Oregon limited liability company, MY, LLC, an Oregon limited liability company, and THE PENNEY KIM TRUST, by and through its Trustee, PENNEY KIM, on behalf of themselves and all others similarly situated, | Case No. _____ <br><br> CLASS ACTION ALLEGATION COMPLAINT <br><br> (RACKETEERING (18 U.S.C. §§ 1962(c)-(d)) <br><br> DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | |
| WAMPLER, CARROLL, WILSON & SANDERSON, P.L.L.C., a Tennessee professional corporation, WADE LAW, LLC, a Tennessee limited liability company, J. LUKE SANDERSON, an individual, and B.J. WADE, an individual, JESSICA | |

COMPLAINT – PAGE 1

SAPIENT LAW™
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

MOLLIGAN, an individual, and JOHN
DOES 1 – 50,

                        Defendants,

CONNER SLEVIN, an individual, and JOHN
DOES 51 - 100,

                        Nominal Defendant.

_____

      COMES NOW Plaintiffs Baek Family Partnership, LLC AB Hollywood, LLC, MY, LLC and The Penney Kim Trust, by and through its Trustee, Penney Kim ("Plaintiffs"), on behalf of themselves and all individuals similarly situated, by counsel, to allege as follows:

## **INTRODUCTION**

      1.      Defendants created a sophisticated racketeering scheme across more than 15 states involving more than four thousand fraudulent demand letters and lawsuits purportedly brought under the Americans with Disabilities Act ("ADA"). At the center of the massive scheme (hereinafter, the "Wampler ADA Racket") were the lawyers and staff of the law firms of Wampler, Carroll, Wilson & Sanderson, P.C. ("Wampler") and Wade Law LLC ("Wade Law"), along with attorneys B.J. Wade and Luke Sanderson (hereinafter collectively, the "Wampler Defendants") in Memphis, Tennessee.

      2.      As part of their racketeering scheme to abuse and contort the ADA's critical civil rights protections for Americans with disabilities, the Wampler Defendants improperly enriched themselves by hiring disabled persons to unwittingly serve as fraudulent "testers" of local businesses for ADA compliance purposes, including Nominal Defendants Conner Slevin and John Does 51-100 (collectively, the "Fake Testers").

      3.      The Wampler Defendants would pay the Fake Testers $200 for every business they ostensibly visited (without actually "testing" or "inspecting"). The Wampler Defendants then connected the Fake Testers to various local attorneys who were hand-picked to facilitate the Wampler ADA Racket (collectively, the "Local Counsel"). The Local Counsel, including

COMPLAINT – PAGE 2

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Defendants Jessica Molligan and John Does 1-50, would send extortionate demands and file lawsuits on the Fake Testers' behalf. The demand letters and lawsuits utilized a complaint prepared by the Wampler Defendants that was copied and pasted, word-for-word across each of the thousands of demands for payment.

4.      The ADA has several strict requirements—including the existence of an actual injury as well as standing to file suit. In order to generate a profitable volume of ADA cases that would generate a lucrative payoff for all of the attorneys involved, the Wampler Defendants, the Local Counsel, and enlisting the assistance of the Fake Testers (collectively, the "Defendants")—knowingly and intentionally fabricated both the existence of an ADA injury as well as the existence of standing to file suit.

5.      Rather than sending the Fake Testers to a particular property to "test" for a specific violation or violations of the ADA, the Wampler Defendants told the Fake Testers that all the Fake Testers needed to do was visit the victim's property, purchase an item and upload a picture of the receipt for the item. The Wampler Defendants expressly told the Fake Testers not to concern themselves with actually finding, confirming, encountering, or even attempting to encounter a specific obstacle or barrier in violation of the ADA. **"There is no need for you to inspect anything,"** the Wampler Defendants wrote, **"because that has already been done."**

6.      In coordination with the Wampler Defendants, the Local Counsel would then send demand letters and file lawsuits claiming that each Fake Tester "recently traveled to the Subject Property . . . and . . . encountered or observed the barriers to access that are detailed in this Complaint, engaged those barriers where physically possible" and "suffered legal harm and legal injury."

7.      In reality, the Wampler Defendants used an automated database to generate lists of purportedly non-compliant properties that were often out-of-date and riddled with errors. For example, the Fake Testers would push back at the Wampler Defendants that they were frequently sent to businesses that were permanently closed and/or that had clearly been out of business for

COMPLAINT – PAGE 3

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

some time. The lists generated by the automated database became increasingly stale over time, because businesses would reappear on lists sent to the Fake Testers month after month until they were visited. Thus, at the actual point in time that any Fake Tester Defendant visited the properties of victim businesses, the Wampler Defendants, Local Counsel, and the Fake Testers had no actual knowledge of the existence of any "injury" under the ADA.

8.      Legal standing to file suit was also fabricated entirely. The Wampler Defendants and Local Counsel falsely claimed that each Fake Tester had patronized each victim's property **"on multiple prior occasions."** The complaints also falsely claimed that each of the Fake Testers were **"routinely where the Subject Property is located"** and that they each "travel[led] in and about the immediate area of the Subject Property numerous times every month, if not every week."

9.      In reality, the Wampler Defendants and the Local Counsel had no idea whether or not the Fake Testers were patrons of, or routinely anywhere near, the victims—they did not even begin trying to collect this information until March 2024, over two years into the racketeering scheme.

10.     All Defendants recklessly disregarded readily ascertainable evidence that their claims to standing were patently false. One of the Fake Testers admitted to an investigative reporter from KGW News that he had never been to the local businesses in question and that one of the businesses was "an hour-and-a-half bus ride from [his] Southeast Portland apartment." Over the course of a three-year campaign of lawsuits and demand letters, another Fake Tester falsely claimed that he was "routinely" in properties covering **nearly the entire St. Louis metropolitan area**, including surrounding suburbs.

11.     Finally, in an effort to finance their scheme to defraud the Plaintiffs and businesses similarly situated (the "Plaintiff Class"), the Local Counsel and the Wampler Defendants often filed applications to proceed *in forma pauperis* (the "*IFP* Applications") in federal district courts throughout the country on behalf of the Fake Testers. Each *IFP*

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Application required truthful responses under penalty of perjury. On the *IFP* Applications, the Fake Testers routinely and intentionally failed to disclose the income they received from the Wampler Defendants in exchange for "visiting" the properties of the Plaintiff Class. To cover up the scheme, Defendants falsely recorded these payments as "expense reimbursements" on checks as well accounting and tax documents.

12.    As described further below, this sophisticated racketeering scheme involved numerous predicate acts of wire fraud and perjury targeting more than four thousand victims nationwide and resulting in as much as $80 million in damages to the Plaintiff Class.

## PARTIES

13.    Plaintiff Baek Family Partnership, LLC, is an Oregon limited liability company with its principal place of business in Oregon.

14.    Plaintiff AB Hollywood, LLC, is an Oregon limited liability company with its principal place of business in Oregon.

15.    Plaintiff MY, LLC, is an Oregon limited liability company with its principal place of business in Oregon.

16.    Plaintiff The Penney Kim Trust, by and through its Trustee, Penney Kim, is a resident of the State of Oregon.

17.    Defendant Wampler, Carroll, Wilson & Sanderson, P.C. ("Wampler") is a Tennessee professional corporation with its principal place of business in Tennessee. Defendant Wampler is one of the Wampler Defendants.

18.    Upon information and belief, Defendant Wade Law LLC is a Tennessee limited liability company with its principal place of business in Tennessee. Defendant Wade Law LLC is one of the Wampler Defendants.

19.    Upon information and belief, Defendant J. Luke Sanderson is an individual, Tennessee licensed attorney, residing in the State of Tennessee. Defendant Sanderson is one of the Wampler Defendants.

COMPLAINT – PAGE 5

20.     Upon information and belief, Defendant B.J. Wade is an individual, Tennessee licensed attorney, residing in the State of Tennessee. Defendant Wade is one of the Wampler Defendants.

21.     Upon information and belief, Defendant Jessica Molligan—one of the "Local Counsel"—is an individual, Oregon licensed attorney, residing in the State of Oregon ("Defendant Molligan").

22.     Upon information and belief, John Does 1-50 are Local Counsel who knowingly and materially participated in the illegal scheme described herein. Further investigation will be required to determine the identities, role and responsibility of those Local Counsel who knowingly and materially furthered this scheme.

23.     Upon information and belief, Nominal Defendant Conner Slevin—one of the "Fake Testers"—is an individual residing in the State of Oregon ("Nominal Defendant Slevin" or "Slevin"). Although Nominal Defendant Slevin is, in a sense, also a victim of the Wampler Defendants' and Local Counsel's conduct, Nominal Defendant Slevin was, nevertheless, at all material times a knowing and active participant in various material components/aspects to the perpetuation (and success) of the Wampler Defendants' scheme, enterprise, and conduct giving rise to this action. Further investigation will be required to determine the extent of Mr. Slevin's role and responsibility in this scheme.

24.     Upon information and belief, Nominal Defendants John Does 51-100 are Fake Testers who knowingly and materially participated in the illegal scheme described herein. Although Nominal Defendants John Does 51-100 are also in a sense, victims of the Wampler Defendants' and Local Counsel's conduct. Further investigation will be required to determine the identities, role and responsibility of those Fake Testers who knowingly and materially furthered this scheme.

///

COMPLAINT – PAGE 6

SAPIENT LAW

425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

**JURISDICTION AND VENUE**

25.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C.

§ 1331 and 18 U.S.C. § 1964(c). Specifically, Plaintiffs' first claim for relief arises under 18

U.S.C. § 1961 *et seq.,* known as the Federal Racketeer Influenced and Corrupt Organizations Act

("Federal RICO"), as set forth more fully below. Further, this Court has supplemental

jurisdiction over Plaintiffs' related state and common law claims under 28 USC § 1367.

26.     Moreover, this Court also has subject matter jurisdiction over Plaintiffs' claims

pursuant to the Class Action Fairness Act (CAFA), 28 USC § 1332(d), because this case is a

putative class action with more than 100 class members, there is minimal diversity between the

parties, and the amount in controversy exceeds $5,000,000 exclusive of interest and costs.

Specifically, the Wampler Defendants have admitted to sending demand letters to, and filing

complaints against, thousands of putative class members—the first subclass alone consists of

more than 100 subclass members. Minimal diversity exists because the named Plaintiffs in this

matter are all citizens of the State of Oregon, and multiple defendants are citizens of the State of

Tennessee. The amount in controversy clearly exceeds $5,000,000 because thousands of putative

class members each suffered tens of thousands of dollars in actual damages. For example, class

members each suffered actual damages in the form of payment of several thousand dollars each

for extortionate and fabricated fees and costs—to say nothing of the cost of property damage,

defense costs and lost income suffered by class members due to construction and property

alterations undertaken in response to the Defendants' false or misleading demand letters and

complaints.

27.     This Court has personal jurisdiction over the Wampler Defendants under 18

U.S.C. § 1965(b) insofar as each, individually and/or collectively, purposely, knowingly and

intentionally directed their scheme and enterprise at and into Oregon, in concert with the Oregon

Local Counsel, causing substantial injury and harm, within Oregon and to Plaintiffs, and because

in any action brought pursuant to the Federal RICO statute in a United States District Court, that

SAPIENT LAW·
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Court may cause the parties residing in another district to be summoned to that Court when the "ends of justice require" it. Here, under the facts/circumstances presented, and given that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over the Wampler Defendants.

28.     This Court has personal jurisdiction over Defendant Molligan insofar as she is a citizen of the State of Oregon, conducting regular and sustained business as a practicing attorney in the State of Oregon.

29.     This Court has personal jurisdiction over John Does 1-50, individually and collectively, because their participation in the Wampler Defendants' scheme and enterprise, described herein as the Wampler ADA Racket, caused substantial injury and harm within Oregon and to Plaintiffs as to establish minimum contacts with this forum such that fairness and justice require that this Court exercise jurisdiction, and because in any action brought pursuant to the Federal RICO statute in a United States District Court, that Court may cause the parties residing in another district to be summoned to that Court when the "ends of justice require" it. Here, under the facts/circumstances presented, and given that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over Nominal Defendants John Does 1-50.

30.     This Court has personal jurisdiction over Nominal Defendant Slevin insofar as he was at all material times a citizen of the State of Oregon.

31.     This Court has personal jurisdiction over Nominal Defendants John Does 51-100 the extent that some or all of John Does 51-100, individually and collectively, participated in the Wampler Defendants' scheme and enterprise, in concert with the Local Counsel, caused substantial injury and harm within Oregon and to Plaintiffs as to establish minimum contacts with this forum such that fairness and justice require that this Court exercise jurisdiction, and because in any action brought pursuant to the Federal RICO statute in a United States District Court, that Court may cause the parties residing in another district to be summoned to that Court

COMPLAINT – PAGE 8

when the "ends of justice require" it. Here, under the facts/circumstances presented, and given

that no other district has personal jurisdiction over all defendants, the ends of justice require this

Court's exercise of personal jurisdiction over Nominal Defendants John Does 51-100.

32.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial part

of the events giving rise to this action occurred in this District, and under 18 U.S.C. § 1965.

Further, all named Plaintiffs and at least two (2) Defendants are Oregon residents.

## FACTS

**I.     THE ADA'S STRICT STATUTORY REGIME AND REQUIREMENTS OF
        ACTUAL INJURY AND STANDING**

33.     The ADA may be enforced by private plaintiffs who have standing to bring suit

for loss of access to, and full enjoyment of, a place of public accommodation.

34.     Successful ADA plaintiffs are entitled to an injunction against ADA violations

and recovery of attorney fees and costs, but are not entitled to any monetary damages award.

35.     However, in order to establish a claim under the ADA, a plaintiff must have

actual knowledge of an ADA violation or barrier to access at a specific location.

36.     In addition, the plaintiff must also have standing to file suit under the ADA.

Standing requires a plaintiff to establish that they have been injured by personally encountering

or becoming aware of an ADA violation. In particular, a plaintiff needs to establish that they

have been affected by the ADA violation(s) at the property in question in a "personal and

individual way."

37.     A plaintiff must also establish, by demonstrating a credible and personal intent to

return to the location in question, that they are likely to suffer injury in the future if the alleged

violations are not remedied.

38.     In some jurisdictions, a plaintiff filing suit under the ADA must also demonstrate

that they were a *bona fide* customer of the place of public accommodation at issue. In those

jurisdictions, a plaintiff filing suit under the ADA cannot be a compensated "tester."

COMPLAINT – PAGE 9

II.    **DEFENDANTS UTILIZE AN ELECTRONIC DATABASE TO SEND THOUSANDS OF DEMAND LETTERS, FILE HUNDREDS OF LAWSUITS IN MORE THAN FIFTEEN STATES SEEKING PAYMENT OF ATTORNEY FEES FOR PURPORTED ADA VIOLATIONS**

39.    The ADA's strict injury and standing requirements prevents scrupulous and honest attorneys from improperly utilizing the ADA as a high-volume, far-reaching, money-making venture.[1]

40.    In particular, the policies underlying the ADA limit the volume of cases to those yielding fee awards to support the legwork required to investigate, identify—and direct a disabled person to encounter, where appropriate—a specific ADA violation at a specific place in time.

41.    The volume issue is compounded by the requirement to identify only those ADA plaintiffs who have been harmed by specific violations and have standing to sue and are willing to sustain the time and effort required to litigate numerous cases. This requires significant time and effort from honest and scrupulous attorneys to check and confirm facts, and that time and effort does not support a "profit-center" style business model comprised of high-volume, legally deficient cases.

42.    The Wampler Defendants in this matter, however, are neither scrupulous nor honest.

43.    The Wampler Defendants created a sophisticated, multi-party scheme to monetize the ADA into a comprehensive, nationwide racket (hereinafter, the "Wampler ADA Racket") by

---

[1] *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (Noting: "[U]nder the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'"); However, "the ADA does not permit private plaintiffs to bring claims as private attorneys general to vindicate other people's injuries." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 960 (9th Cir. 2011) (quoting *McInnis–Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003)

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

manufacturing fake ADA violations through a phony third-party "inspection" scheme, fabricating standing for potential plaintiffs with blatantly false, copied and pasted allegations, hiding payments to those potential plaintiffs, and fraudulently and unethically abusing settlement authority from their unsuspecting clients, the Fake Testers.

44.     The Wampler ADA Racket consisted of at least four separate parts: (A) the Wampler database, (B) the fee agreement and power of attorney, (C) the fraudulent, misrepresented, or misleading ADA violations, and (D) thousands of predicate acts of wire fraud consisting of demand letters and draft complaints with allegations each of the Defendants knew or should have known to be materially false and misleading.

**A.  The Wampler Database**

45.     *First*, the Wampler Defendants created a database (the "Wampler Racket Database"). Likely utilizing third party mapping, road and traffic imagery, the Wampler Defendants identified tens of thousands of target victims with potential ADA violations across more than a dozen states and judicial districts.

46.     The Wampler Defendants focused on potential ADA violations related to the width of painted parking spaces, the angle of parking lot access ramps, the visibility of signage, and other similar violations that they believed they could determine remotely and electronically using third-party imagery and/or software.

**B.  The Wampler Fee Agreement**

47.     *Second*, the Wampler Defendants contacted dozens of disabled persons throughout the country to solicit them to be potential plaintiffs in ADA litigation and work as Fake Testers. The Wampler Defendants offered to pay these individuals $200 for every property on the Wampler Racket Database that they visited.

48.     In exchange for receiving $200 for each property visited, the Fake Testers signed a Representation Agreement purporting to grant the Wampler Defendants blanket power of attorney to complete all settlement negotiations and sign all legal papers on their behalf.

COMPLAINT – PAGE 11

SAPIENT LAW™
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

**C. The Faked ADA Violations**

49.    Third, the Wampler Defendants apportioned to each of the Fake Testers a small number of properties to visit each month from the larger Wampler Racket Database, sending instructions to the Fake Testers urging them not to concern themselves with actually looking for, confirming or encountering, any specific ADA violation on any specific victim's property.

50.    Instead, the Wampler Defendants merely required the Fake Testers to purchase a candy bar, obtain a business card, and send a picture of themselves while located on the property along with a receipt.

51.    The Fake Testers would then purportedly visit the properties owned by the Plaintiff Class and purchase an item or obtain a business card or brochure and upload the receipt and a picture of themselves on the property to the Wampler Racket Database via an online portal accessed through the Wampler website.

**D. The Wire Fraud**

52.    Finally, once the Fake Testers uploaded a picture of themselves on the victim's property, the Wampler Defendants would instruct the Local Counsel to send a demand letter to the owner of each local business' property. Each demand letter would attach a "draft complaint" from a template generated by the Wampler Defendants.

53.    The draft complaints used by the Wampler Defendants in thousands of demand letters and lawsuits were each copied and pasted from the same template—down to using the same paragraph numbers and the same exact language concerning injury, standing and the like.

54.    The demand letters sent by the Local Counsel demanded that all purported ADA violations be remediated by the property owners and further demanded that the Plaintiff Class members settle the dispute with the payment of purported attorney fees.

55.    When the Plaintiff Class members failed to settle the matters by paying money to the Wampler Defendants and the Local Counsel, they would frequently file suit using the same copied and pasted Complaint.

COMPLAINT – PAGE 12

SAPIENT LAW™
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

56.     In total, the Wampler Defendants have (internally) admitted that the Wampler ADA Racket has sent more than four thousand (4000) demand letters to the Plaintiff Class and Defendants and filed more than one thousand (1000) federal district court complaints.

## III.    DEFENDANTS FABRICATE PURPORTED KNOWLEDGE OF ADA VIOLATIONS/BARRIERS WITH KNOWING AND/OR RECKLESS INDIFFERENCE TO THE TRUTH

57.     In order to generate a sufficient volume of cases to form a profitable ADA racket, the Wampler Defendants and the Local Counsel both knew (or should have known) that they needed to reduce the amount of attorney time and effort required to actually research and confirm the existence of an ADA injury with respect to any particular victim of the scheme.

58.     The Wampler Defendants and the Local Counsel accomplished that goal by divorcing the Fake Testers entirely from Wampler's process of targeting potential victims and simply lying about the Fake Testers sustaining any actual injury under the ADA.

### A.  Defendants Knew or Should Have Known That Allegations in their Demand Letters and Complaints Are False and Materially Misleading with Respect to the Occurrence of Any ADA Injury

59.     Rather than sending the Fake Testers to a particular property to "test" for a specific violation or violations of the ADA, the Wampler Defendants told the Fake Testers that all the Fake Testers needed to do was visit the victim's property, purchase an item and upload a picture of the receipt for the item to the Wampler Racket Database. The Wampler Defendants (and Local Counsel) knew or should have known that they were giving the Fake Testers false and materially misleading instructions.

60.     In fact, the Wampler Defendants expressly told the Fake Testers not to concern themselves with actually finding, confirming, encountering or even attempting to encounter a specific obstacle or barrier in violation of the ADA.

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

61.    For example, on December 15, 2022, the Wampler Defendants requested via e-mail that one such Fake Tester, Slevin target a victim located at "18520 SW Farmington Rd. Aloha, OR 97007."

62.    The Wampler Defendants told Slevin that the Wampler Defendants had already "determined" the property "to be non-compliant with the ADA" at some prior unknown date and time, which the Wampler Defendants knew or should have known was a false and/or materially misleading representation.

63.    The instructions given by the Wampler Defendants to Slevin did not detail any specific ADA violation. And Slevin visited the victim's property without knowing of the existence or location of any specific ADA violation.

64.    "There is no need for you to inspect anything," the Wampler Defendants told Slevin, "because that has already been done."

65.    These same instructions were copied and pasted into each and every instruction that the Wampler Defendants gave to Slevin and to each and every Fake Tester prior to a visit to any Plaintiff Class victim's property.

66.    After the Fake Testers uploaded a receipt for an item purchased from a victim business to the Wampler Racket Database, the Wampler Defendants and the Local Counsel would perform a mail merge to send a demand letter accompanied by drafts of the template Wampler complaint to the victim/property owner.

67.    The name of the Fake Testers who visited the victim's property would be added to draft complaints that were copied and pasted from the Wampler template wholesale.

68.    Every single complaint sent by the Wampler Defendants and the Local Counsel (both in draft form accompanied by a demand letter and in final 'filed' form) to the Plaintiff Class falsely claimed that each Fake Tester was "deterred from patronizing and/or gaining equal access" to each victim's property.

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

69.     Every single complaint sent by Defendants (both in draft and final 'filed' form) to the Plaintiff Class falsely claimed that each Fake Tester's access to the property was "denied and/or limited because of [their] disabilities."

70.     Every single complaint sent by the Wampler Defendants and the Local Counsel (both in draft form accompanied by a demand letter and in final "filed" form) to the Plaintiff Class falsely claimed that each Fake Tester "recently traveled to the Subject Property . . . and . . . encountered or observed the barriers to access that are detailed in this Complaint, engaged those barriers where physically possible" and "suffered legal harm and legal injury."

71.     Every single complaint sent by the Wampler Defendants and the Local Counsel (both in draft form accompanied by a demand letter and in final 'filed' form) falsely claimed that "[t]he discriminatory violations described above are not an exhaustive list of the Defendant's current barriers to equal access and violations of the ADA because [the Fake Tester] was unable to access and assess all areas of the subject premises due to the architectural barriers encountered."

72.     At the time the Wampler Defendants and the Local Counsel sent these demand letters and filed these complaints, they knew or should have known that these communications were false or material misrepresentations because the Fake Testers had no actual knowledge of an ADA violation, had been expressly told they need not concern themselves with observing or encountering any specific barrier to access, and had been expressly told they need not document any specific barrier to access at any victims' property at the time of their visit.

**B. Defendants Fabricate a Third-Party Inspection Process that Likely Never Existed**

73.     Unbeknownst to the Fake Testers, the Wampler Defendants fabricated the existence of a third party "inspection" scheme that likely never occurred.

74.     The Wampler Defendants often requested that the Fake Testers visit properties that the Fake Testers would discover to be permanently closed or out of business. Each time the Fake Testers reported that their target victim was permanently closed or out of business, the

COMPLAINT – PAGE 15

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Wampler Defendants would send the same automated message that someone else had already inspected the property and "determined" the property "to be non-compliant with the ADA."

75.    This caused consternation for the Fake Testers, who would not get paid by the Wampler Defendants unless they were able to purchase an item and submit a receipt to the Wampler Racket Database—which they could not do at businesses that were permanently closed and/or out of business.

76.    The problem came up repeatedly. Eventually, the Wampler Defendants had to address it. In an e-mail to the Fake Testers on August 9, 2023, the Wampler Defendants wrote: "[i]f you have an issue with a property, such as . . . the property is permanently closed, please message us through the portal using the chat function."

77.    Again and again, the Wampler Defendants would falsely claim to have sent "inspectors" to properties that the Fake Testers would find to be shuttered. Again and again, the Wampler Defendants would write: "[t]here is no need for you to inspect anything because that has already been done."

78.    The Fake Testers repeatedly pushed back at the errors and inaccuracies in the Wampler Racket Database and the false claims of third-party property inspections.

79.    In one e-mail sent on September 25, 2023, Slevin complained to the Wampler Defendants: "Also, you tried to send me to the 777 gas station a couple of months ago and it is closed permanently . . .[i]s there anyway that you can delete my entire que and give me a succinct list of locations that are not permanently closed. . . .?"

**C.  Defendants Act in Reckless Disregard for the Truth with Respect to Whether Any ADA Injury Had Ever Actually Occurred**

80.    By separating the visits of the Fake Testers from the purported third-party inspections, the Wampler Defendants also knew or should have known that significant amounts of time would pass from the moment information was added to the Wampler Racket Database and any actual visitation by a Fake Tester.

COMPLAINT – PAGE 16

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

81.     In fact, typically weeks or even months would pass between purported "inspections" and the Fake Tester visits.

82.     The Wampler Defendants would send new victims to each Fake Tester at the beginning of each month. The Fake Testers had until the end of each month to visit an assigned property, meaning that throughout the fraudulent scheme in question, weeks could pass between Wampler's instructions and any actual property visit.

83.     Not just weeks—sometimes months. In lists of target victims sent by the Wampler Defendants to Fake Testers like Slevin, properties that were not addressed or resolved by Slevin in the Wampler Racket Database by the end of the month would reappear in subsequent months until they were visited.

84.     Over time, whatever purported ADA violation led to a victim being added to the Wampler Racket Database to begin with would become more and more stale by the time the properties were actually visited by the Fake Testers (who, as noted earlier, were not looking for the presence or absence of any specific characteristic or violation on the properties of these local businesses).

85.     Thus, even if every single victim on the Wampler Racket Database was, in fact, non-compliant with the ADA at some point in time, the Wampler Defendants acted with reckless disregard for the merits of their claims by failing to confirm that any purported ADA non-compliance actually limited and/or deterred the Fake Testers from patronizing any of the victim properties at any specific date and time.

86.     The Wampler Defendants knew or should have known that they had a problem in this regard, and repeatedly tried to urge the Fake Testers to visit the victims faster by dangling additional monetary incentives. In one e-mail sent by the Wampler Defendants to the Fake Testers on March 9, 2023, the Wampler Defendants claimed that "[v]isits after the 1st of the month cause disruptions to our accounting people who are trying to get checks ready on the 6th for clients who visited timely the preceding month."

COMPLAINT – PAGE 17

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

87.    In a March 9, 2023, email, the Wampler Defendants urged the Fake Testers to "[p]lease try to visit as soon as feasible, rather than waiting till the end of the month."

## IV.    DEFENDANTS FABRICATE ADA STANDING WITH KNOWING AND/OR RECKLESS INDIFFERENCE TO THE TRUTH

88.    In order to generate a sufficient volume of cases to form a profitable ADA-based racketeering enterprise, both the Wampler Defendants and the Local Counsel also knew or should have known that they needed to reduce the amount of attorney time and effort required to actually research and confirm the existence of ADA standing with respect to any particular victim of the scheme.

89.    The Wampler Defendants and the Local Counsel accomplished that goal by completely fabricating allegations of standing to bring claims of ADA violations against the Plaintiff Class.

90.    Every single complaint sent by the Wampler Defendants and the Local Counsel (both in draft form accompanied by a demand letter and in final 'filed' form) falsely claimed that each Fake Tester had patronized each victim's property "on multiple prior occasions."

91.    In reality, the Wampler Defendants and Local Counsel had no idea whether the Fake Testers had ever visited the victims before, and never even asked prior to sending demand letters and/or filing suit.

92.    For example, another Fake Tester, Justin Burley-Beavers admitted to an investigative reporter from KGW News that "most of the locations were not places he'd visited before."

93.    In fact, the Wampler Defendants internally assumed that for most of the victims, the Fake Testers had never been patrons before. "Please go online as soon as possible," the Wampler Defendants wrote to Slevin on February 11, 2023, "to determine the area of town for the locations, as well as their days and times of operation."

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

94.     Every single complaint sent by the Wampler Defendants and the Local Counsel (both in draft form accompanied by a demand letter and in final 'filed' form) also falsely claimed that each of the Fake Testers were "routinely where the Subject Property is located" and that they each "travel[led] in and about the immediate area of the Subject Property numerous times every month, if not every week."

95.     In reality, the Wampler Defendants and the Local Counsel had no idea whether or not the Fake Testers were routinely anywhere near the victims—and frequently ignored readily ascertainable evidence that they were not.

96.     Fake Tester Burley-Beavers, for example, does not drive himself. On June 21, 2023, Burley-Beavers visited a strip mall and nail salon on Southwest Canyon Road in Beaverton. Burley-Beavers told an investigative reporter from KGW News that the nail salon was "an hour-and-a-half bus ride from [his] Southeast Portland apartment."

97.     In another example, over the course of a two-year racketeering campaign targeting businesses located in the St. Louis metropolitan area, Fake Tester David Malcich filed more than forty-five cases in federal district court and sent numerous additional demand letters targeting local businesses. Each demand letter attached a "draft complaint" that Malcich and various Local Counsel purporting to represent him—including Amy Ashbrook and Jonathan F. Andres—threatened to file. And each time, the Wampler Defendants and the Local Counsel repeated the same copied and pasted standing allegations that neither the Wampler Defendants nor the Local Counsel had bothered to review for truthfulness.

98.     The Wampler Defendants and the Local Counsel targeting of local businesses in St. Louis, Missouri through purported representation of David Malcich was so prolific that over the course of three years, Defendants falsely claimed that Malcich was "routinely" in properties covering nearly the entire St. Louis metropolitan area, including the surrounding suburbs, an area of more than sixty-one square miles.

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

99.     The Wampler Defendants further falsely claimed that Malcich travelled in the "immediate area" of properties throughout nearly the entire St. Louis metropolitan area "numerous times every month, if not every week."

   a.  **FIGURE 1: Locations Where the WAMPLER ADA RACKET Claimed that David Malcich Visited "Routinely . . . Numerous Times Every Month, If Not Every Week"**



100.    Figure 1 shows a map of the victims that Malcich sued in federal court. Figure 1 does not even include the victims (number unknown) who received demand letters and/or settled prior to litigation. Malcich, encouraged by the reckless disregard of the Wampler Defendants and Local Counsel, essentially claimed to be everywhere at all times in order to fabricate standing to further the Wampler Defendants' and Local Counsel' fraudulent scheme.

COMPLAINT – PAGE 20

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

101.    Two years later, and thousands of victims into the fraudulent scheme, the Wampler Defendants finally realized they had a problem, and began trying to cover their tracks. On March 27, 2024, the Wampler Defendants sent an e-mail to the Fake Testers stating that: "[w]e have added a new question to the visitation form which you need to answer . . . [t]he question is 'Reason for being in the area.'"

102.    Acknowledging that standing allegations for thousands of cases and demand letters had simply been fabricated, the Wampler Defendants wrote that they needed the information "to demonstrate to the court that you regularly travel in this area." The Wampler Defendants offered various suggested answers to the Fake Testers, including: "[t]his gas station is on my way to work" or "friend's house" or "doctor's office," or "movie theater" or "grocery store" or "I travel in this area because there is a restaurant or bar I go to often" or "I have family or friends that I visit in the area."

103.    It would be "great," the Wampler Defendants wrote, "if you can provide a simple one-sentence answer that our local counsel can use to show that this location is visited . . . by you."

104.    By then, however, the damages from the Wampler Defendants' fraudulent scheme had already been incurred by many of the victims in the Plaintiff Class. Thousands of demand letters and complaints had already been sent with the same copied and pasted allegations of standing for which Wampler Defendants and the Local Counsel acted in reckless disregard of truth.

105.    Shortly after sending their March 27, 2024 e-mail, the Wampler ADA Racket began to unravel, and the reckless disregard for truth by the Wampler Defendants and the Local Counsel became more apparent—Justin Burley-Beavers admitted to an investigative reporter from KGW News that "most of the locations [targeted by Defendants] were not places he 'planned to return to.'"

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

V.     **THE FAKE TESTERS PERJURE THEMSELVES IN *IFP* APPLICATIONS TO AVOID PAYING COURT FEES AND DEFRAUD THE FEDERAL GOVERNMENT**

106.     In order to generate a sufficient volume of cases to form a profitable ADA racket, the Wampler Defendants and the Local Counsel also both knew or should have known that they needed to reduce the amount of court fees and expenses incurred with the filing of more than one thousand federal district court cases.

107.     In furtherance of the unlawful Wampler ADA Racket's scheme to defraud the Plaintiff Class, the Local Counsel and the Wampler Defendants often filed applications to proceed in forma pauperis (the "*IFP* Applications") in federal district courts throughout the country on behalf of the Fake Testers.

108.     Each *IFP* Application required truthful responses under penalty of perjury. The *IFP* Applications required the Fake Testers to disclose the amount, nature, and source of any income they received or expected to receive and to state that they were unable to afford the required filing fees.

109.     On the *IFP* Applications, the Fake Testers routinely and intentionally failed to disclose the income they received from the Wampler Defendants in exchange for visiting the properties of the Plaintiff Class.

110.     Electronic signatures with electronic signature receipt numbers were added to each *IFP* Application on behalf of many of the Fake Testers personally. The signatures were added under language that stated: "I declare under penalty of perjury that the information below is true."

111.     Specifically, Local Counsel David Foster and Conner Spani filed perjurious *IFP* Applications on behalf of Burley-Beavers in at least six federal cases filed in the District of Oregon between January and December 2023, including applications submitted in Case Number 3:23-cv-00073 on January 17, 2023, and in Case Number 3:23-cv-01890 on December 14, 2023.

SAPIENT LAW

425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Each of these applications failed to disclose the income Burley-Beavers received from the Wampler Defendants for being a Fake Tester.

112.     In or about February 2024, Defendant Molligan began representing Burley-Beavers as local counsel. At that time, Burley-Beavers began filing cases—more than a dozen over the following six months—in which he paid the required filing fees, despite previously asserting that he was unable to do so. Burley-Beavers never corrected or withdrew *IFP* Applications previously filed in the same district court two months prior in which he represented that he lacked the financial wherewithal to pay court filing fees.

113.     Similarly, Jordan David Greenberg filed perjurious *IFP* Applications on behalf of Brian Muniz in federal cases filed in the Northern District of Illinois in 2023 and 2024. Muniz filed one such perjurious *IFP* Application on February 13, 2024, in Case Number 1:24-cv-01224, claiming to be unemployed with no other income besides disability payments.

114.     Upon discovering that Muniz only applied to proceed in forma pauperis in some cases—and in others paid the required filing fee—a federal court in the Northern District of Illinois entered a minute order noting that "Plaintiff has filed over a dozen ADA cases in this district in the last year and paid the filing fee in a few instances" and requiring Plaintiff to "file an amended in forma pauperis application ensuring that all questions are fully and accurately answered or pay the required filing fee." Greenberg and Muniz subsequently withdrew the *IFP* Application and paid the filing fee.

115.     The perjury of the Fake Testers as to the *IFP* Applications, suborned by both the Local Counsel and the Wampler Defendants, furthered the scheme to defraud the Plaintiff Class by defrauding the federal government to subsidize serial litigation against the Plaintiff Class.

116.     Absent the perjury and repeatedly securing *IFP* status, the overall economics of the scheme to defraud the Plaintiff Class would have been less favorable to the Wampler Defendants and the Local Counsel as it would have required out-of-pocket expenditure of more than $400 in cases where they were often demanding an approximate $10,000 in settlement.

COMPLAINT – PAGE 23

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

## VI.    DEFENDANTS FALSIFY BUSINESS RECORDS TO HIDE PAYMENTS TO THE FAKE TESTERS

117.    As noted above, in many jurisdictions, one cannot establish standing under the ADA as a paid "tester" of ADA compliance. Thus, in each of the thousands of complaints sent or filed by the Wampler Defendants and the Local Counsel, the Fake Testers claimed to be both an "advocate for the disabled" as well as an actual patron of the business in question—who intended to return as a patron in the future—in order to cover all of their bases.

118.    Both allegations were fabricated.

119.    Not only did the Wampler Defendants and Local Counsel collect no evidence that any of the Fake Testers had ever previously patronized (or intended to return to patronize) the properties owned by the Plaintiff Class, the Wampler Defendants also made significant effort to hide their payment scheme with respect to the visits by the Fake Testers to avoid discovery in jurisdictions where being a paid "tester" is insufficient to confer standing.

120.    The Fake Testers received checks from "Wampler, Carroll, Wilson and Sanderson" which were delivered electronically with memo lines describing the checks as "Expense Reimbursement." The checks were all digitally signed by Defendant J. Luke Sanderson. These checks included one check transmitted by Wampler Defendants in Tennessee to Slevin in Oregon on August 11, 2023, with "Expense Reimbursement" in the memo line.

121.    The Fake Testers were never asked to submit mileage for reimbursement, and the amounts of the checks never varied based on the price of the item (if any) that the Fake Testers purchased. The Wampler Defendants always paid $200 per location visited.

122.    Upon information and belief, by falsely characterizing these payments as "reimbursement," the Wampler Defendants avoided withholding state or federal payroll taxes on these payments and never submitted 1099 forms to report non-employment income to the federal government. Many of the Fake Testers were making thousands of dollars per year in income

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

from the Wampler Defendants. Fake Tester Burley-Beavers and Nominal Defendant Slevin were routinely making more than $600 per month in income from the Wampler Defendants.

123.    Upon information and belief, the Wampler Defendants also avoided recording the promise of $200 per visit in writing to avoid having to produce any payment agreement in discovery. The Wampler Defendants then falsified their Representation Agreement with each and every Fake Testers to falsely state that the clients would not be compensated for prosecution of the case and that the Wampler Defendants would solely compensate the Fake Testers for "reasonable expenses incurred by the Client in an amount already agreed upon."

## VII.    DEFENDANTS FABRICATE SETTLEMENT DEMANDS ON BEHALF OF CLIENTS WHO WERE INTENTIONALLY KEPT IN THE DARK

124.    The demand letters sent by the Local Counsel repeatedly and materially misrepresented their settlement authority.

125.    The Representation Agreement between the Fake Testers and the Wampler Defendants provided that "[a]ttorneys are authorized and empowered to act as a negotiator in any and all settlement negotiations."

126.    However, both the Wampler Defendants and the Local Counsel treated this language as a blanket authorization to settle cases and even to sign settlement agreements on behalf of their clients without sharing the details of the attorney fees they were recouping as part of the scheme with the Fake Testers.

127.    Both the Wampler Defendants and the Local Counsel then repeatedly lied to the Plaintiff Class members in demand letters insisting—on behalf of the Fake Testers—upon the payment of attorney's fees that had yet to be even accrued or incurred in order to resolve any claim, including for fictitious "monitoring" expenses. In reality, the Wampler Defendants and the Local Counsel had no monitoring process, and the Fake Testers generally had no knowledge of the specific attorney fees being demanded.

SAPIENT LAW

425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

128.    For example, on or about February 13, 2024, Defendant Molligan sent a letter to Plaintiff Penney Kim Trust claiming that Defendant Slevin was "requesting $9,500 in attorney fees and costs associated with this case" and that this figure "encompasses tasks yet to done," including "monitoring fees." At that time, Defendant Molligan had done little more than send two demand letters attaching the template Wampler complaint, with all of its materially false allegations.

129.    Unbeknownst to Plaintiff Penny Kim Trust, Defendant Molligan's February 13, 2024, letter was sent without the knowledge or approval of Slevin. Upon information and belief, the vast majority of settlement demands made by the Local Counsel and the Wampler Defendants were sent without the knowledge or approval of the purported client.

130.    As a result of demand letters received from Defendant Molligan, sent at the direction of the Wampler Defendants, Plaintiff Penney Kim Trust paid thousands of dollars to Defendant Molligan and the Wampler Defendants to settle Slevin's fictitious and fabricated claims to have sustained an ADA injury on Plaintiff Penney Kim Trust's property.

131.    Had Plaintiff Penney Kim Trust known that Defendant Molligan and the Wampler Defendants lacked settlement authority on behalf of Slevin and had not informed Slevin of the terms of the settlement, Plaintiff Penny Kim Trust never would have undertaken the transaction.

132.    Plaintiffs Baek Family Partnership ("Baek"), MY, LLC and AB Hollywood, LLC each incurred significant damages in the form of attorney fees paid to defend against the demand letters received from Defendants as well as lawsuits subsequently wrongfully filed against them.

133.    At some point in or about early 2024, this aspect of the Wampler scheme began to draw more scrutiny as cases settled. The Wampler Defendants wrote to the Fake Testers, claiming in an e-mail on May 9, 2024, that they were "trying to get our cases expedited so that we do not have to put everyone back on pause." The Wampler Defendants complained that the Fake Testers were taking too long too long to sign settlement agreements. The Wampler

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

Defendants wrote that they needed "to get our settlement agreements signed sooner . . . so, we are having everyone sign a Durable Power of Attorney."

134.    "We want a specific letter," the Wampler Defendants wrote, "that we can show to the court."

## VIII.    DEFENDANTS DAMAGE THE PROPERTIES OF THE PLAINTIFF CLASS

135.    The demand letters and draft complaints sent by the Local Counsel would often cite a litany of vague references to conditions on the properties owned by the Plaintiff Class, alleging improper "parking facilities" and "maintenance practices," including such purported violations as "faded" paint lines or signage, "cracked pavement," and accessible parking spaces that were not "adequately dispersed."

136.    For example, Defendant Molligan on behalf of Slevin on or about August 25, 2023, sent a letter to Plaintiff Baek alleging that Baek had a "practice of . . . neglecting its continuing duty to . . . discover transient accessible elements which by the nature of their design or placement . . . are prone to shift from compliant to noncompliant." This language was generated by the Wampler Defendants and reused in complaints and demand letters sent by each of the Local Counsel. Legally and factually, it is gibberish.

137.    On behalf of Slevin, Defendant Molligan accused Plaintiff Baek of having "cracked pavement" and accessible parking that was not "adequately dispersed." Again, this language was generated by the Wampler Defendants and reused in complaints and demand letters sent by each of the Local Counsel.

138.    Defendant Molligan and Slevin demanded cash settlements and "repairs" to the subject properties within ninety days. Defendant Molligan and Slevin threatened to file suit and serve a "Rule 34 Notice of Entry Upon Land to conduct a thorough inspection of your property."

139.    Based in part upon these misrepresentations, Plaintiff Baek and other members of the Plaintiff Class undertook to make (often imprecise and/or unnecessary) alterations to their

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

properties that they would not have undertaken had the scope of the misrepresentations been known to them.

140.    Based in part upon these misrepresentations, Plaintiff Baek and other members of the Plaintiff Class sustained property damage due to heavy construction, excavations, drilling, removal of paint and signage.

141.    Plaintiff Baek, specifically, paid tens of thousands of dollars to contractors and incurred days of limited access to the subject property because of excavation and construction.

142.    Based in part upon these misrepresentations, Plaintiff Baek and other members of the Plaintiff Class in the form of loss of use and enjoyment of commercial property, including temporary or permanent closures of businesses to accommodate construction and construction equipment, excessive noise deterring customers, and air emissions from construction and construction equipment deterring customers.

## NATIONWIDE CLASS ALLEGATIONS

143.    Plaintiffs bring this action on behalf of themselves and a Plaintiff Class initially defined as follows:

144.    All persons or organizations sued or threatened with suit by the WAMPLER ADA RACKET, during the period from January 1, 2022 to the present.

145.    Excluded from the class are Defendants, any entity in which any Defendant has a controlling interest, Defendants' officers, directors, and employees; Defendants' legal representatives, heirs, successors, and assigns; and any Judge to whom this case is assigned and his or her immediate family.

146.    Plaintiff Penney Kim also brings this action on behalf of a subclass of the Plaintiff Class initially defined as follows.

147.    FIRST SUBCLASS: All persons or organizations sued or threatened with suit by the WAMPLER ADA RACKET, during the period from January 1, 2022, to the present, who

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

paid anything of value to the Wampler Defendants or the Local Counsel in order to resolve purported claims asserted against them by the Wampler Defendants or the Local Counsel.

148. This action has been brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

149. Numerosity. Class and subclass members are so numerous that their individual joinder herein is impracticable. Plaintiffs estimate that the class numbers are in the thousands, and that the subclass numbers are in the hundreds or thousands. The precise number of class and subclass members and their addresses are unknown to Plaintiffs, but can be obtained from the records of the Wampler Defendants and the Local Counsel. Class and subclass members may be notified of the pendency of this action by mail, supplemented by published notice if deemed necessary by the Court.

150. Commonality. Common questions of law and fact exist as to all class and subclass members. These questions predominate over the questions affecting only individual class or subclass members and include:

151. Whether the transmission of demand letters to the Plaintiff Class containing the material misrepresentations described herein constitutes wire fraud;

152. Whether the transmission of *IFP* Applications by the Fake Testers purporting to show no income constitutes perjury and whether such perjury was suborned by the Local Counsel and the Wampler Defendants;

153. Whether the Defendants constitute an "enterprise" as defined in 18 U.S.C. § 1961(4) that is engaged in, or the activities of which affect, interstate or foreign commerce;

154. Whether the policies and practices described herein constitute Defendants' conduct or participation, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity;

155. Whether Defendants have violated 18 U.S.C. § 1962(c);

COMPLAINT – PAGE 29

156.     Whether Defendants have conspired to violate 18 U.S.C- § 1962(c), in violation of 18 U.S.C, § 1964(d);

157.     Typicality. Plaintiffs' claims are typical of the claims of the class, because, as with all other class members, Plaintiffs received demand letters and/or were sued by Defendants with the exact same copied and pasted complaints taken from the Wampler template, making them victims of the Wampler ADA Racket. Each of the Plaintiffs incurred damages in the form of either property damage, loss of use, attorney fees and defense costs or all of the above.

158.     Plaintiff Penney Kim Trust's claims are typical of the claims of the subclass, because, as with all other subclass members, Plaintiff Penny Kim Trust paid a sum of money to resolve purported claims asserted against the Penney Kim Trust by the Wampler Defendants and the Local Counsel.

159.     Adequacy. Plaintiffs are adequate representatives of the class and subclass, because their interests do not conflict with those of the class or subclass, and they have retained counsel experienced and competent in both class action litigation and commercial litigation. The interests of the class and subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

160.     Superiority. The class action is superior to other available means for the fair and efficient adjudication of class and subclass members' claims. The damages or other financial detriment suffered by individual class and subclass members is relatively small compared to the burden and expense that would be incurred by individual litigation of their claims against Defendants. It would thus be virtually impossible for class and subclass members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if class and subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the

COMPLAINT – PAGE 30

class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

161.    Predominance. Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

162.    In the alternative, the class and subclass may be certified under Rule 23(b)(l) and/or (b)(2), because:

(i)     the prosecution of separate actions by individual class or subclass members would create a risk of inconsistent or varying adjudication with respect to individual class or subclass members that would establish incompatible standards of conduct for Defendants;

(ii)    the prosecution of separate actions by individual class or subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class or subclass members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or,

(iii)   adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

## **FIRST CLAIM FOR RELIEF**

### (VIOLATIONS OF RICO 18 U.S.C. § 1962(c))

### (CLASS CLAIMS)

163.    Plaintiffs incorporate each of the allegations in the preceding paragraphs, as well as the allegations stated in the Second and Third Claims for Relief below, as if restated here.

COMPLAINT – PAGE 31

164.    At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

165.    Each Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and Plaintiffs have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of the RICO Act violations" described herein.

166.    Defendants constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact. Each Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein. Defendants have all participated in the formation and operation of this scheme to defraud the Plaintiff Class.

167.    Defendants established the Wampler ADA Racket and have intentionally and willfully committed more than four thousand predicate acts of wire fraud through the use of interstate communications containing materially false and misleading statements, known to be false and misleading by Defendants, as part of a scheme or artifice to defraud the members of the Plaintiff Class into paying settlements for purported claims that were known to lack merit, in violation of 18 U.S.C. §§ 1341, 1343.

168.    Defendants did willfully or knowingly conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of wire facilities, in violation of § 1343 (wire fraud).

169.    Defendants—individually and collectively—have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. § 1343), within the past ten years, as described herein.

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

170.     Specifically, the illegal enterprise committed the predicate act of wire fraud in its August 25, 2023, correspondence with Baek Family Partnership by falsely claiming the existence of an ADA injury, knowing that the Fake Testers had not actually reported encountering any specific condition on the Plaintiff's property and had not even been asked to look for any specific condition. Defendants intentionally misrepresented this fact for the purpose of obtaining cash payments as part of a scheme to defraud in violation of 18 U.S.C. §§ 1341, 1343.

171.     Each of the Local Counsel, with the knowledge, approval and/or direction of both the Fake Testers and the Wampler Defendants, sent similar communications in violation of 18 U.S.C. §§ 1341, 1343.

172.     The illegal enterprise again committed wire fraud in its February 13, 2024, correspondence with Plaintiff Penney Kim Trust falsely claiming to have obtained settlement authority from Slevin that did not in fact exist. The Wampler Defendants and Local Counsel intentionally misrepresented this fact for the purpose of obtaining cash payments as part of a scheme to defraud in violation of 18 U.S.C. §§ 1341, 1343.

173.     Each of the Local Counsel, with the knowledge, approval and/or direction of the Wampler Defendants, sent similar communications in violation of 18 U.S.C. §§ 1341, 1343.

174.     The illegal enterprise also filed perjurious *IFP* Applications with the knowledge and approval of the Fake Testers, the Local Counsel and the Wampler Defendants. Such incidents of perjury include *IFP* Applications filed by Justin Burley-Beavers in Case Number 3:23-cv-00073 on January 17, 2023, and in Case Number 3:23-cv-01890 on December 14, 2023.

175.     These were not isolated incidents. Instead, the Defendants engaged in a pattern of racketeering activity by committing thousands of related predicate acts in a three-year period, in the form of wire fraud, and there remains a threat that such conduct will continue or recur in the future. That each Defendant participated in a variety of schemes involving thousands of predicate acts of wire fraud establishes that such fraudulent acts are part of the Wampler Defendants' regular way of doing business.

COMPLAINT – PAGE 33

176.     As described herein, each Defendant participated in the operation or management of the enterprise, the WAMPLER ADA RACKET, and directed the affairs of the enterprise through a pattern of racketeering activity.

177.     Specifically, the Local Counsel operated the scheme by sending demand letters to the Plaintiff Class falsely asserting that their clients had sustained an ADA injury knowing lacking any evidence that their clients had encountered any specific access barrier at any property of the Plaintiff Class. The Local Counsel transmitted and signed settlement agreements falsely representing that they had the capacity to sign on behalf of their clients and knowing that no such authority existed.

178.     The Wampler Defendants managed the overall scheme through the Wampler Racket Database by sending instructions to Fake Testers that expressly instructed the Fake Testers not to inspect the properties of the Plaintiff Class for any violation of the ADA. The Wampler Defendants further supplied the false language in the draft complaints used by the Local Counsel in each copied and pasted complaint filed or transmitted as part of the enterprise.

179.     The Fake Testers were critical to the operation of the scheme by signing complaints and *IFP* applications that were known to be false by the Fake Testers, who had been expressly instructed by the Wampler Defendants not to inspect the properties of the Plaintiff Class and merely to purchase a small item and be compensated $200.

180.     The multiple acts of racketeering activity that the Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

181.     The enterprise is engaged in, and its activities affect, interstate commerce. The enterprise's leadership is based in Memphis, Tennessee. The enterprise operates throughout the United States, including the District of Oregon, as well as in Missouri, Georgia, Washington and numerous other states.

COMPLAINT – PAGE 34

182.    Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through fraudulent demand letters and lawsuits that contained material misrepresentations known by Defendants to be false at the time. Defendants further acted in reckless disregard of the truth by intentionally failing to even inquire as to the merits of the claims being asserted and filed that would have revealed the falsity of the purported claims asserted.

183.    Plaintiffs and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiffs and the Class have been deceived and forced to pay attorney fees to defend against purported claims that lacked merit at the time they were asserted, both as to the lack of any knowledge of any actual ADA injury as well as the lack of any of the grounds for standing repeatedly asserted in language that was copied and pasted from one Defendant to the next.

184.    Had the members of the Plaintiff Class known that the demand letters and complaints were materially false and misleading about the existence of an ADA injury and standing, the members of the Plaintiff Class would not have suffered such extensive costs and fees to defend against the false claims and could have had appropriate remedies in any litigation, including sanctions under the federal rules of civil procedure.

185.    Plaintiff Penney Kim Trust and the members of the first subclass have also been deceived, coerced and forced to pay settlements to resolve purported claims that lacked merit at the time they were asserted, both as to the lack of any knowledge of any actual ADA injury as well as the lack of any of the grounds for standing repeatedly asserted in language that was copied and pasted from one Defendant to the next.

186.    Had the members of the Plaintiff Class known that the demand letters and complaints were materially false and misleading about the existence of an ADA injury and

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

standing, the members of the Plaintiff subclass would never have paid Defendants for purported

attorney fees to settle purported claims that lacked merit to begin with.

187.    Defendants committed these racketeering acts intentionally and knowingly, with

the specific intent to defraud and to personally or directly profit from these actions.

## SECOND CLAIM FOR RELIEF

### (NEGLIGENT MISREPRESENTATION)

### (CLASS CLAIMS)

188.    Plaintiffs incorporate each of the allegations in the preceding paragraphs, as well

as the allegations stated in the Third Claim for Relief below, as if restated here.

189.    Defendants, acting as agents of the Fake Testers, sent demand letters and draft

complaints to the members of the Plaintiff Class which misrepresented that the Fake Testers had

visited the properties of the Plaintiff Class and had "encountered and/or observed" certain

"barriers to access" while visiting the properties and had "suffered legal harm and legal injury."

190.    Defendants, acting as agents of the Fake Testers, sent demand letters and draft

complaints to the members of the Plaintiff Class which misrepresented that the Fake Testers

"could not fully" access the properties of the Plaintiffs and that the Fake Testers were "unable to

access and assess all areas of the subject premises due to the . . . barriers encountered."

191.    The Fake Testers, by and through Defendants, and in the exercise of due care,

knew or should have known that those representations were false.

192.    The demand letters and draft complaints drafted by the Wampler Defendants and

sent by the Local Counsel would often cite a litany of vague references to the "parking facilities"

and "maintenance practices" of the Plaintiff Class, including "faded" paint lines or signage,

"cracked pavement," and accessible parking spaces that were not "adequately dispersed."

193.    Defendants, acting as agents of the Fake Testers, sent demand letters and draft

complaints to the members of the Plaintiff Class which demanded cash settlements and "repairs"

to the subject properties within ninety days.

COMPLAINT – PAGE 36

194.    In the event the Plaintiff Class members refused to settle, Defendants would threaten to file suit and serve a "Rule 34 Notice of Entry Upon Land to conduct a thorough inspection of your property."

195.    However, the demand letters sent by the Defendants also repeatedly and materially misrepresented their settlement authority. Defendants lacked the proper authority to settle the demands set forth in their demand letters absent consent of their clients, which the Wampler Defendants and Local Counsel (intentionally or negligently) misrepresented to Plaintiff Class that they had from their Fake Tester clients.

196.    Defendants breached their duty of care and diligence to the Plaintiff Class in failing to accurately represent their lack of settlement authority as well as their clients' lack of standing, lack of cognizable injury, lack of actual encounter with any specific barrier to access, and lack of evidence of the same.

197.    Based in part upon these misrepresentations, it was foreseeable that members of the Plaintiff Class would undertake to make alterations to their properties that they would not have undertaken had the scope of the misrepresentations been known to them, nor undertaken if the misrepresentations had never been made.

198.     Based in part upon these misrepresentations, the properties owned by the members of the Plaintiff Class sustained property damage due to heavy construction, excavations, drilling, removal of paint and signage.

199.    Based in part upon these misrepresentations, members of the Plaintiff Class sustained damages, including but not limited to the loss of use and enjoyment of commercial property, including temporary or permanent closures of businesses to accommodate construction and construction equipment, excessive noise deterring customers, and air emissions from construction and construction equipment deterring customers.

///

///

COMPLAINT – PAGE 37

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

## THIRD CLAIM FOR RELIEF

### (ABUSE OF PROCESS)

### (FIRST SUBCLASS)

200.    Plaintiffs incorporate each of the allegations in the preceding paragraphs, as if restated here.

201.    The Wampler Defendants and the Local Counsel advised, procured, encouraged and stirred up the Fake Testers, the majority of which (if not all) were effectively indigent, to commence and prosecute false claims and/or complaints against the Plaintiff Class. In so doing, the Wampler Defendants and the Local Counsel maliciously intended to injure, harass, and damage the Plaintiff Class, and put the Plaintiff Class to great vexation and expense, unlawfully and without reasonable or probable cause, and without having any interest in the myriad claims and/or complaints directed against the Plaintiff Class.

202.    By virtue of the circumstances and indigence of the Fake Testers, the Plaintiff Class is unable to obtain satisfaction and recourse against the Fake Testers, the majority of which (if not all) are also victims of the Wampler Defendants' and the Local Counsels' conduct, a situation caused by and through the scheme and abuses, among others, of the improper maintenance, champerty, and barratry pursued by the Wampler Defendants and the Local Counsel,[2] and the myriad false claims and/or complaints they directed against the Plaintiff Class.

203.    By virtue of their abuse of the legal process based upon overt lies asserted in the claims and/or complaints, the Wampler Defendants and the Local Counsel have damaged the properties of the Plaintiff Class by fraudulently inducing and/or compelling excavations, construction, and nuisance on the subject properties.

---

[2] *See, e.g., In re Primus,* 436 U.S. 412, 424 n.15, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) ("Put simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty.") (citations omitted).

COMPLAINT – PAGE 38

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone  503 417 7777
fax  503 417 4250

204.    The Wampler Defendants and the Local Counsel have wrongfully, negligently, and/or intentionally used property inspection notices and threats of the same to avoid pleading truthful allegations in complaints related to the existence (or lack thereof) of ADA violations on the subject properties.

205.    The Wampler Defendants and the Local Counsel have also caused damage to the Plaintiff Class in the form of extorting false and fraudulent settlement payments and attorneys' fees incurred defending against the false claims of the Wampler Defendants.

## FOURTH CLAIM FOR RELIEF

### (EQUITABLE ACCOUNTING)

### (CLASS CLAIMS)

206.    Plaintiffs incorporate each of the allegations in the preceding paragraphs, as if restated here.

207.    Incidental and ancillary to the relief sought above, any trust accounts and billings for the various Fake Testers' matters (likely exceeding thousands of separate matters), including the sums derived—and the characterization of those sums—by the Wampler Defendants are complex, requiring the equitable power and oversight of the Court to perform a full accounting of the same.

208.    The Court should appoint a special master to perform a full and comprehensive accounting of the Wampler Defendants' Fake Testers' accounts and associated billings which is required to assess and determine the total sums derived by and shared among the Wampler Defendants as part of their scheme and the claims of the Plaintiff Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

a.    Certification for this matter to proceed as a class action.

COMPLAINT – PAGE 39

SAPIENT LAW
425 NW 10th Avenue, Suite 200
Portland, OR 97209
phone 503 417 7777
fax 503 417 4250

b.  Actual damages (including all direct and consequential damages), statutory damages, treble damages (under 18 U.S.C. § 1964) as pled herein and/or to the extent permissible under applicable law.

c.  Injunctive and declaratory relief.

d.  Equitable Accounting.

e.  Attorneys' fees and costs.

f.  Punitive damages.

g.  Post-judgment interest on the entire judgment until paid in full.

h.  Any such further relief that the Court determines is just and equitable in the premises.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  <u>April 10, 2025</u>          **SAPIENT LAW**


By: <u>s/ Joseph M. Mabe          </u>
   Joseph M. Mabe, OSB No. 045286
   Email: joe@sapientlaw.com
   Neal S. Shechter, OSB No. 185119
   Email:  neal@sapientlaw.com
   Keith A. Pitt, OSB No. 973725
   Email: keith@sapientlaw.com

   *Of Attorneys for Plaintiffs*

COMPLAINT – PAGE 40