**PETER D. HAWKES,** OSB No. 071986
peter@angelicalfo.com
**TYLER P. FRANCIS,** OSB No. 162519
tylerf@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Of Attorneys for Plaintiffs Baek Family
Partnership, LLC, AB Hollywood, LLC,
Abraham Lee 4511, LLC, and The Penney
Kim Trust, on behalf of themselves and all
others similarly situated*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| BAEK FAMILY PARTNERSHIP, LLC, an Oregon limited liability company; AB HOLLYWOOD, LLC, an Oregon limited liability company; ABRAHAM LEE 4511, LLC, an Oregon limited liability company; and THE PENNEY KIM TRUST, by and through its Trustee, PENNEY KIM; on behalf of themselves and all others similarly situated, | Case No. 25-cv-00584-AN <br><br> PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT <br><br> REQUEST FOR ORAL ARGUMENT |
| Plaintiffs, | |
| v. | |
| WAMPLER, CARROLL, WILSON & SANDERSON, P.L.L.C., a Tennessee professional corporation; J. LUKE SANDERSON, an individual; B.J. WADE, an individual; JESSICA MOLLIGAN, an individual; CONNER SLEVIN, an individual; and JOHN DOES 1 – 100, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.   The Wampler Defendants, together with their Local Counsel and Fraudulent Testers in their employ, develop a racketeering scheme to extract settlement payments from unwitting property owners based on fraudulent ADA claims. ................................................................................. 3

    B.   Plaintiffs were each a victim of the Wampler racketeering scheme. ................................... 6

III.  ARGUMENT ......................................................................................................... 9

    A.   Legal standard. ............................................................................................... 9

    B.   Litigation-related activities can serve as "predicate acts" for a RICO claim. ..................... 9

        1.   On multiple occasions, the Ninth Circuit has entertained RICO claims where litigation-related activities served as "predicate acts." ........................................................... 10

        2.   *Acres Bonusing* has rightly been rejected as inconsistent with Ninth Circuit and U.S. Supreme Court authority. ............................................................................... 10

        3.   Even under the Wampler Defendants' erroneous line of authority, Plaintiffs' allegations would state a RICO claim. ............................................................................... 13

    C.   Plaintiffs have alleged multiple predicate acts of wire fraud for purposes of their RICO claim. .......................................................................................................... 15

        1.   Plaintiffs have alleged that Defendants' demand letters and complaints contained material misrepresentations. ............................................................................. 15

            a.   The demand letters and complaints misrepresent the Fraudulent Testers' injury and standing. ........................................................................................... 15

            b.   The demand letters misrepresent Defendants' settlement authority and actual attorney fees incurred. ......................................................................................... 18

        2.   Plaintiffs plead their RICO claim with sufficient particularity under Rule 9(b). ............ 19

    D.   Plaintiffs' RICO claim is not barred by the *Noerr-Pennington* doctrine because it falls within the "sham litigation" exception. ................................................................... 20

IV.   CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbondanza v. Weiss*,
　　Civil Action No. 19-cv-00328-TMT-MEH, 2022 WL 889909 (D. Colo. Mar.
　　24, 2022) ...............................................................................................................13, 15

*Acres Bonusing, Inc. v. Ramsey*,
　　Case No. 19-cv-05418-WHO, 2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ............ *passim*

*Ameritox, Ltd. v. Aegis Servs. Corp.*,
　　No. 07-80498-CIV, 2008 WL 2705435 (S.D. Fla. Jul. 9, 2008) ............................................21

*Bishop v. E.A. Strout Realty Agency*,
　　182 F.2d 503 (4th Cir. 1950) ...............................................................................................23

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
　　631 F.3d 939 (9th Cir. 2011) ...............................................................................................16

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*,
　　758 F. Supp. 2d 153 (E.D.N.Y. 2010) ...................................................................................13

*Dal Pozzo v. Basic Machinery Co., Inc.*,
　　463 F.3d 609 (7th Cir. 2006) (applying 28 U.S.C. § 1927).....................................................22

*Deutsch v. Flannery*,
　　823 F.2d 136 (9th Cir. 1987) ...............................................................................................20

*Ghandi v. Ehrlich*,
　　Civil Action No. 1:19-cv-03511-SDG, 2020 WL 5633416 (N.D. Ga. Sep. 21,
　　2020) ...................................................................................................................................14

*Kim v. Kimm*,
　　884 F.3d 98 (2d Cir. 2018)..............................................................................................13, 14

*Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*,
　　431 F.3d 353 (9th Cir. 2005) ...............................................................................................10

*McDonald v. Smith*,
　　472 U.S. 479 (1985).............................................................................................................22

*Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*,
　　436 F. Supp. 2d 1095 (C.D. Cal. 2006) .................................................................................20

*Pettibone v. Russell*,
　　59 F.4th 339 (9th Cir. 2023) ...................................................................................................9

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007)......................................................................................................12

*Relevant Group, LLC v. Nourmand*,
    Case No. CV 19-05019 PSG, 2023 WL 4291654 (C.D. Cal. May 24, 2023) ...............9, 10, 11

*Saniefar v. Moore*,
    Case No. 1:17–cv–00823–LJO–BAM, 2017 WL 5972747 (E.D. Cal. Dec. 1,
    2017) ..........................................................................................................................22

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)................................................................................................11, 12

*Shields v. Credit One Bank, N.A.*,
    32 F.4th 1218 (9th Cir. 2022) .......................................................................................9

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...........................................................................10, 11, 20

*U.S. v. Eisen*,
    974 F.2d 246 (2d Cir. 1992)...........................................................................................12

*U.S. v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021) .......................................................................................11

*U.S. v. Lee*,
    427 F.3d 881 (11th Cir. 2005) .................................................................................12, 14

*U.S. v. Lloyd*,
    807 F.3d 1128 (9th Cir. 2015) .......................................................................................17

*U.S. v. Pendergraft*,
    297 F.3d 1198 (11th Cir. 2002) .....................................................................................14

*U.S. v. Schaffer*,
    600 F.2d 1120 (5th Cir. 1979) .......................................................................................22

*U.S. v. Tucker*,
    254 F. Supp. 3d 620 (S.D.N.Y. 2017).............................................................................12

*Underwood v. Future Income Payments, LLC*,
    Case No. SA CV 17-1570-DOC, 2018 WL 4964333 (C.D. Cal. Apr. 26, 2018)....................20

**Statutes**

18 U.S.C. § 1343.................................................................................................................12

18 U.S.C. § 1961(1).............................................................................................................12

18 U.S.C. §§ 1962(c), 1963(a), 1964(c) ........................................................................12

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................2, 19, 20

Fed. R. Civ. P. 11(b)(3)..................................................................................................22

Fed. R. Civ. P. 12(b)(6)................................................................................................2, 9

## I.  INTRODUCTION

Defendants Wampler, Carroll, Wilson & Sanderson, P.L.L.C., J. Luke Sanderson, and B.J. Wade (the "Wampler Defendants") engaged in a nationwide, highly lucrative scheme to pervert the intent and purpose of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), by turning it into a money-making machine for themselves through the assertion of bad-faith and fraudulent ADA claims. The Wampler Defendants would recruit and pay their "clients"—such as Defendant Conner Slevin—to visit business properties that they believed were (or at least *at one point* were) noncompliant with the ADA. The Wampler Defendants never bothered to inquire whether their clients actually observed or encountered any barriers to their use and enjoyment of the property—in fact, they actively encouraged their clients *not* to look for them. Nor did the Wampler Defendants bother to inquire whether their clients had visited the property before, intended to return to the property, or were deterred from doing so. Instead, the Wampler Defendants would team with local counsel in the property's jurisdiction—such as Defendant Jessica Molligan—to send demand letters to the property owners based on allegations of ADA injuries and standing for which they had no actual evidentiary foundation, seeking thousands of dollars in attorney fee reimbursements that they had not actually incurred, based on purported settlement authority that they did not actually have. If the property owner did not immediately capitulate, the Wampler Defendants would have their local counsel up the pressure by filing suit, using a cut-and-paste form complaint that the Wampler Defendants had generated, and that contained the same rote allegations of ADA injury and standing, regardless of the actual facts. Any remediation of ADA violations was entirely beside the point—the whole purpose of the scheme was to generate settlement payments that would be split between the Wampler Defendants and their local counsel. Plaintiffs, each a victim of the Wampler Defendants'

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 1

fraudulent scheme, have brought claims against them under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO").

The Wampler Defendants now seek to avoid accountability for their corrupt scheme by moving to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[1] The Wampler Defendants advance three arguments in support of their motion, but each one fails.

First, the Wampler Defendants contend that litigation-related activity cannot, as a matter of law, be considered a "predicate act" for purposes of civil RICO claims. That is not, however, the law in the Ninth Circuit—and for good reason. The "rule" the Wampler Defendants urge is based not on the statute's text or other evidence of Congressional intent, but on *policy* considerations that are already addressed through other legal doctrines. As a matter of simple statutory interpretation, the Wampler Defendants' "rule" simply cannot stand. Moreover, even the cases purportedly supporting that "rule" recognize its limitations—specifically, that it does not apply where, as here, there is a massive scheme involving both litigation activities and other corrupt out-of-court conduct.

Second, the Wampler Defendants argue that Plaintiffs have not alleged any predicate acts of wire fraud against them—or at least not with the particularity required by Fed. R. Civ. P. 9(b). But Plaintiffs allege that, in demand letters sent to and/or complaints filed against them, the Wampler Defendants and their cooperating local counsel misrepresented their clients' ADA injuries and standing, their settlement authority, and the amount of attorney fees they had actually incurred—all of which directly and materially harmed Plaintiffs by convincing them to make settlement payments and/or incur litigation expenses and property alteration expenses that they otherwise would not have. Plaintiffs have alleged their claims with full particularity in each

---

[1] Defendant B.J. Wade is not among the moving parties on this motion.

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 2

of their own cases—amounting to at least four predicate acts of wire fraud—and have also alleged with sufficient particularity a similar pattern of activity affecting thousands of other putative class members, further details of which will be obtained in discovery that is currently in the Wampler Defendants' possession.

Finally, the Wampler Defendants argue that their litigation-related conduct is not actionable under the *Noerr-Pennington* doctrine, which limits claims arising out of petitioning activities protected by the First Amendment to the U.S. Constitution. But the *Noerr-Pennington* doctrine recognizes an exception for "sham litigation," which the Wampler Defendants' conduct certainly is. The Wampler Defendants threatened or actually commenced a series of thousands of lawsuits without regard for their merits, asserted objectively baseless claims, and made multiple material representations to the courts, all for the improper and unlawful purpose of coercing Plaintiffs and others like them to pay the Wampler Defendants and their local counsel attorney fees that they did not earn pursuant to settlement authority they did not have based on ADA claims they had no factual basis to assert.

The Wampler Defendants' motion to dismiss should be denied.

## II. STATEMENT OF FACTS

The following facts are alleged in Plaintiffs' Amended Complaint and therefore must be assumed to be true for purposes of this motion.

**A.      The Wampler Defendants, together with their Local Counsel and Fraudulent Testers in their employ, develop a racketeering scheme to extract settlement payments from unwitting property owners based on fraudulent ADA claims.**

Under the ADA, disabled persons who personally encounter or become aware of ADA violations that constitute barriers to their access to a place of public accommodation and who intend to return to the property may bring a lawsuit seeking an injunction against those ADA

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 3

violations and an award of their attorney fees and costs. (Am. Compl. ¶¶ 33–38.) The Wampler Defendants—all attorneys based in Tennessee—developed a sophisticated, multi-party scheme to monetize the ADA into a comprehensive, nationwide racket that involved a sham third-party "inspection" regime, fabricated allegations of ADA injuries and standing, and fraudulent and unethical abuse of their settlement authority from their clients. (*Id.* ¶¶ 1, 18–20, 43.)

First, likely by using third-party mapping, road, and "street-view" imagery, the Wampler Defendants created a database of tens of thousands of target businesses with potential ADA violations across more than a dozen states and judicial districts. (*Id.* ¶¶ 45–46.)

Next, the Wampler Defendants solicited disabled persons around the country to visit the target businesses the Wampler Defendants had identified, offering them $200 for each property that they visited. (*Id.* ¶ 47.) In exchange, those disabled persons—the "Fraudulent Testers"—would enter into a representation agreement with the Wampler Defendants purporting to grant the Wampler Defendants blanket power of attorney to negotiate settlements and sign legal papers on their behalf. (*Id.* ¶ 48.) The Wampler Defendants instructed the Fraudulent Testers not to concern themselves with encountering, or even observing, any ADA violations at the target businesses. (*Id.* ¶ 49.) Rather, the Fraudulent Testers were instructed simply to purchase a small item to otherwise obtain proof of their visit and then send a picture of themselves on the property along with a receipt though the Wampler Defendants' online portal. (*Id.* ¶¶ 50–51.) Thus, the Wampler Defendants had no way of knowing whether the Fraudulent Testers actually encountered or observed any barrier to their use and enjoyment of the property. (*See id.* ¶¶ 62–68.) That deficiency was further compounded by the fact that the Wampler Defendants' database was often woefully stale and out-of-date, leading the Wampler Defendants to frequently send Fraudulent Testers to properties that were permanently closed or out of business—and meaning

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 4

that the Wampler Defendants had no idea whether the properties remained non-compliant. (*Id.* ¶¶ 77–93.) The Wampler Defendants' process also meant that they had no way of knowing whether the Fraudulent Testers had any intent to return to the property or were in any way deterred from doing so—which, in many instances, was not the case. (*Id.* ¶¶ 94–112.) To hide the nature of their relationship to the Fraudulent Testers, the Wampler Defendants falsified business records and committed tax fraud by mischaracterizing their $200 payments as "expense reimbursements" rather than payment for services rendered. (*Id.* ¶¶ 124–131.)

The next step in the Wampler Defendants' scheme was to retain local counsel for the Fraudulent Testers in the jurisdiction where the property was located ("Local Counsel"), including, in Oregon, Defendant Molligan. (*Id.* ¶¶ 3, 21–22.) After the Fraudulent Testers had completed their role in the scheme, the Wampler Defendants would instruct Local Counsel to send a demand letter, accompanied by a draft complaint, to the property owner, using a mail merge process. (*Id.* ¶¶ 52, 69–70.) If the property owner failed to agree to a monetary settlement, Local Counsel was instructed to then file suit using the same complaint. (*Id.* ¶¶ 55–56.) The complaints were simply cut and pasted from a standard template generated by the Wampler Defendants, and each contained identical—and false—allegations regarding the alleged ADA injury and standing. (*Id.* ¶¶ 53, 71–75.) The Wampler Defendants' standard form co-counsel agreement with Local Counsel explained that the entire purpose of the scheme was to "attempt to achieve a settlement" with the victim property owners (to be split between the Wampler Defendants and Local Counsel at 70% and 30%, respectively), with Local Counsel being the face of settlement negotiations but relying entirely on the Wampler Defendants to "investigate" the alleged ADA violations and to draft the complaints. (*Id.* ¶¶ 7, 56–57.) Purporting to rely on their representation agreements with the Fraudulent Testers, Local Counsel and the Wampler

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 5

Defendants would represent to property owners that they had full settlement authority and would even sign settlement agreements on the Fraudulent Testers' behalf without informing them of the details of the settlement, including the attorney fees they were recouping. (*Id.* ¶¶ 132–134.) The Wampler Defendants and Local Counsel would also misrepresent to property owners the actual attorney fees they had incurred, or would incur, in connection with the action in an effort to inflate their recovery. (*Id.* ¶ 136.)

If the ADA claim ended up in court, the misrepresentations would continue. In addition to the false assertions of ADA injury and standing in their complaints for which the Wampler Defendants and their Local Counsel had no reasonable basis, the Wampler Defendants and Local Counsel would frequently file *in forma pauperis* applications on behalf of Fraudulent Testers in an effort to minimize costs and thus increase the profits of the enterprise. (*Id.* ¶¶ 113–114, 123.) Those applications—signed under penalty of perjury—would omit the payments the Fraudulent Testers received from the Wampler Defendants for visiting the properties, despite the requirement to disclose the amount, nature, and source of any income they received. (*Id.* ¶¶ 115–122.)

In total, the Wampler Defendants and their Local Counsel have sent more than 4,000 demand letters and filed more than 1,000 federal district court complaints as part of the racketeering scheme. (*Id.* ¶ 59.)

**B.    Plaintiffs were each a victim of the Wampler racketeering scheme.**

As detailed in the Amended Complaint, Plaintiffs Baek Family Partnership, LLC ("Baek"), AB Hollywood, LLC ("AB Hollywood"), Abraham Lee 4511, LLC ("Abraham Lee 4511"), and the Penney Kim Trust, through its Trustee, Penney Kim (the "Penney Kim Trust"), were each among the over 4,000 victims of the Wampler racketeering scheme described above.

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 6

AB Hollywood's travails are likely already well-known to this Court, as they were the subject of a well-publicized sanctions award against Defendant Molligan. The facts provide a stark illustration of virtually every aspect of the Wampler racketeering scheme. Like other Fraudulent Testers, Defendant Slevin was paid $200 by the Wampler Defendants for visiting AB Hollywood's property, which the Wampler Defendants inaccurately characterized as a "reimbursement"—an unethical arrangement of which Defendant Molligan was aware and in which she was complicit. (Am. Compl. ¶ 129.) Defendant Molligan, as Local Counsel working with the Wampler Defendants, sent AB Hollywood a demand letter seeking $13,000 in attorney fees—an amount that "grossly overestimated" any work that had been or would be done prior to litigation—and later filed suit on Slevin's behalf. (Am. Compl. ¶¶ 137, 143.) Defendant Molligan admitted that the allegations of ADA violations against AB Hollywood were based on a purported "inspection report" provided to her by the Wampler Defendants. (*Id*. at 78.) But photographs taken by the Fraudulent Tester, Defendant Slevin, directly contradicted the allegations of specific ADA violations stated in the demand letter and the complaint. (*Id*. ¶ 76.) Defendant Molligan also admitted that she did not ask Defendant Slevin whether he had visited the property before or intended to return, even though she knew that was a key part of his alleged claim. (*Id*. ¶ 98.) Once news reports concerning the Wampler Defendants' scheme came out, Defendant Slevin withdrew any authority to pursue the case that he had previously provided to the Wampler Defendants or Defendant Molligan—but Defendant Molligan continued to prosecute and attempt to settle the case anyway. (*Id*. ¶¶ 85, 135.) The court found that the case against AB Hollywood was brought "in bad faith" without any meaningful investigation of the facts, and solely for the "improper purpose" of generating fees—*not* remediating any alleged ADA violations. (*Id*. ¶ 58.)

Plaintiff Baek also received a demand letter from Defendant Molligan on behalf of Defendant Slevin, which alleged ADA violations that were either nonsensical or simply cut and pasted from a form generated by the Wampler Defendants, and demanded a cash settlement under threat of litigation. (Am. Compl. ¶¶ 147–149, 175.) In response, Baek undertook unnecessary, costly, and disruptive alterations to its property in an effort to address the vague and/or nonexistent alleged violations. (*Id*. ¶¶ 150–153.) Like AB Hollywood, Baek was later sued by Defendant Molligan on behalf of Defendant Slevin, and Baek incurred significant attorney fees defending that case before it was voluntarily dismissed as the Wampler racket began to unravel. (*Id*. ¶ 143.)

Plaintiff Abraham Lee 4511 received two separate demand letters—one from Molligan, and another from a different Local Counsel working with the Wampler Defendants—on behalf of Fraudulent Tester Justin Burley-Beavers and, when he did not accede to that demand, Defendant Molligan filed suit, resulting in the expenditure of attorney fees and, ultimately, a settlement payment. (Am. Compl. ¶ 142.) Defendant Molligan subsequently filed a lawsuit in state court to collect the settlement payment, causing Abraham Lee 4511 to incur additional attorney fees—but when Abraham Lee 4511 sought discovery from Burley-Beavers, Molligan dismissed the lawsuit. (*Id*.) Abraham Lee 4511 alleges that the settlement agreement was the product of deception and coercion based on meritless claims made without any knowledge concerning the existence of an actionable ADA injury or standing. (*Id*. ¶ 190.)

Plaintiff Penney Kim Trust likewise received a demand letter from Defendant Molligan on behalf of Defendant Slevin containing materially false allegations concerning Slevin's ADA injury and standing and demanding payment of attorney fees far in excess of those Molligan had actually incurred in preparing demand letters using the Wampler Defendants' template

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 8

complaint. (Am. Compl. ¶ 138.) As a result of Molligan's demand letters, Penney Kim Trust paid thousands of dollars in settlement, which it would not have done had it known of the fabricated claims of ADA injury or Molligan's lack of actual settlement authority. (*Id.* ¶¶ 140–141, 177, 190.)

### III. ARGUMENT

**A.    Legal standard.**

In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must "assume the truth of the facts alleged in the complaint." *Pettibone v. Russell*, 59 F.4th 339, 450 (9th Cir. 2023). The Court must also "draw all reasonable inferences in favor of" Plaintiffs. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022).

**B.    Litigation-related activities can serve as "predicate acts" for a RICO claim.**

The Wampler Defendants rely primarily on a single case from the Northern District of California—*Acres Bonusing, Inc. v. Ramsey*, Case No. 19-cv-05418-WHO, 2022 WL 17170856, at *11 (N.D. Cal. Nov. 22, 2022)—as well as various out-of-Circuit authorities for the proposition that a civil RICO claim cannot rely on litigation-related activities—no matter how frivolous or in bad faith—as "predicate acts" of wire fraud. But the Ninth Circuit has entertained civil RICO claims based on litigation-related activities on multiple occasions. Based on that Ninth Circuit (and U.S. Supreme Court) precedent, *Acres Bonusing* was squarely (and correctly) rejected in a case from the Central District of California—*Relevant Group, LLC v. Nourmand*, Case No. CV 19-05019 PSG (KSx), 2023 WL 4291654, at *9–*11 (C.D. Cal. May 24, 2023). Moreover, even if the "rule" the Wampler Defendants urge *did* apply, it is not ironclad—and this case fits well within its exceptions.

1.    **On multiple occasions, the Ninth Circuit has entertained RICO claims where litigation-related activities served as "predicate acts."**

In *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006), the Ninth Circuit considered whether the defendant's "sending of demand letters was conduct immunized from RICO liability under the *Noerr-Pennington* doctrine." The court held that pre-suit demand letters are protected under *Noerr-Pennington*, but that the "sham litigation" exception may apply to allow a RICO suit based on such demand letters. *Id*. at 932–38. At no point, however, did the court suggest that demand letters were simply not actionable as "predicate acts" under RICO.

Similarly, in *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 356–58 (9th Cir. 2005), the plaintiffs asserted a RICO claim where the "predicate acts" were litigation-related conduct—namely, concealing evidence from discovery in prior litigation between the parties. The Ninth Circuit reversed judgment on the pleadings, or alternatively summary judgment, in favor of the defendants, holding that "the predicate acts alleged by Plaintiffs" were sufficient to support a RICO claim because the plaintiffs had adequately alleged and shown that they reasonably relied on the defendants' misrepresentations. *Id*. at 362–63. Again, at no point did the court indicate that the RICO claim failed because it was based on litigation-related activities.

2.    ***Acres Bonusing* has rightly been rejected as inconsistent with Ninth Circuit and U.S. Supreme Court authority.**

*Acres Bonusing*—the only case from within the Ninth Circuit on which the Wampler Defendants rely—has been subjected to withering criticism, and rightly so. In *Relevant Group*, the plaintiff filed civil RICO claims with the defendants' litigation activities—namely, legal challenges to the plaintiff's hotel projects under the California Environmental Quality Act. 2023 WL 4291654, at *3–*6. As here, the defendants argued that, "based on their reading of the caselaw, litigation activity may never serve as a predicate act for civil RICO." *Id*. at *9. The

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 10

court rejected that argument, finding that it did "not see room in the caselaw for Defendants' proposed per se rule . . ." *Id*. The court observed that, in *Sosa*, the Ninth Circuit had "applied the *Noerr-Pennington* doctrine to this very context[,]" and that case "seems to instruct this Court to analyze Defendants' conduct through the *Noerr-Pennington* doctrine and sham exception[.]" *Id*. at *9–*10. The court rejected the defendants' argument that *U.S. v. Koziol*, 993 F.3d 1160 (9th Cir. 2021), "suggested that litigation activities in civil RICO cases are granted special protection[,]" concluding that *Koziol* "merely distinguished civil RICO cases from the case at bar—criminal liability for extortion under the Hobbs Act." *Id*. at *10 (citing *Koziol*, 993 F.3d at 1173–76). The court further observed that, "if *Koziol* were read to suggest that civil RICO should be granted special treatment based on policy concerns, that reading would be in tension with" the U.S. Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481–500 (1985), which "rejected the idea that the civil and criminal RICO provisions should be construed differently based on policy concerns." *Id*. The court held that, "[b]ased on that guidance from precedent, it would also make sense not to treat a predicate act differently just because it forms the basis of a civil RICO claim . . . . The best approach then is for this Court to be guided by precedent not policy." *Id*. at *11. The court then specifically rejected *Acres Bonusing*, finding that it wrongly "relied heavily on the policy concerns implicated by allowing litigation activities to form the basis of a civil RICO claim[.]" *Id*.

The *Relevant Group* court was right to reject *Acres Bonusing* and its policy-based reasoning. As *Sosa* demonstrates, the policy concern animating *Acres Bonusing* and the out-of-Circuit authorities on which it relies—namely, the concern that every unsuccessful litigation could be spun into a civil RICO claim—is already adequately addressed through the protections

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 11

provided by the *Noerr-Pennington* doctrine (addressed in greater detail below), which would bar such claims in the absence of "sham" litigation.

Moreover, treating litigation-related activities differently than other potential "predicate acts" for purposes of civil RICO claims—but *not* criminal RICO claims—would run counter to the "standard principle of statutory construction…that identical words and phrases within the same statute should normally be given the same meaning." *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Under RICO, engaging in a "pattern of racketeering activity" in the conduct of an enterprise's affairs can give rise to both criminal and civil liability. *See* 18 U.S.C. §§ 1962(c), 1963(a), 1964(c). 18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, wire fraud under 18 U.S.C. § 1343. Nothing in that statute, by its terms, distinguishes between litigation and non-litigation activities. And litigation activities can, of course, form the basis for a wire fraud criminal prosecution. *See, e.g.*, *U.S. v. Tucker*, 254 F. Supp. 3d 620, 624–25 (S.D.N.Y. 2017); *cf. also U.S. v. Lee*, 427 F.3d 881, 891 (11th Cir. 2005) (same with respect to mail fraud). Litigation activities can also constitute predicate acts for purposes of a criminal RICO prosecution. *See, e.g.*, *U.S. v. Eisen*, 974 F.2d 246, 251–54 (2d Cir. 1992). Interpreting RICO to allow litigation activities to serve as predicate acts in criminal RICO actions but not in civil RICO actions would necessitate interpreting identical statutory terms *differently* in the criminal and civil contexts. As the Supreme Court said in *Sedima* with respect to a similar attempt to distinguish between criminal and civil RICO violations, "We should not lightly infer that Congress intended [a] term to have wholly different meanings in neighboring subsections." 473 U.S. at 489.

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 12

**3.    Even under the Wampler Defendants' erroneous line of authority, Plaintiffs' allegations would state a RICO claim.**

Even if the Court were to consider application of the erroneous rule announced in the cases the Wampler Defendants cite—despite its dubious foundation—that rule is not *per se* or absolute. As *Acres Bonusing* acknowledges, "[l]itigation activities alone *generally* cannot serve as predicate acts for civil RICO claims." 2022 WL 17170856, at *10 (emphasis added); *see also Abbondanza v. Weiss*, Civil Action No. 19-cv-00328-TMT-MEH, 2022 WL 889909, at *15 (D. Colo. Mar. 24, 2022) ("While case law shows reluctance to expand RICO's coverage to the 'litigation activities' context, there is no absolute bar."). Litigation activities *can* serve as predicate acts if "there are allegations of wrongdoing outside of the litigation, such as out-of-court activity or corruption." *Acres Bonusing*, 2022 WL 17170856, at *10; *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 176 (E.D.N.Y. 2010) (litigation activities may form basis for RICO claim where they were part of "an extensive and broader scheme to defraud defendants…"). In the leading case supporting the Wampler Defendants' proposed rule, *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018), the court expressly "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless[,]" and suggested that, for example, if the defendants engaged in a "massive scheme" that included both litigation conduct and "other out-of-court actions to further [the litigation] activity[,]" a civil RICO claim may lie. The court limited its holding to the proposition "only that where, as here, a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.*; *see also id*. at 104 ("allegations of frivolous, fraudulent, or baseless litigation activities—***without more***—cannot constitute a RICO predicate act") (emphasis added).

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 13

Here, the Amended Complaint alleges precisely such out-of-court activity and corruption—the "more" required by *Kim*. Plaintiffs allege that, prior to commencing any litigation, the Wampler Defendants caused their co-conspiring Local Counsel to send fraudulent demand letters to Plaintiffs and other similarly situated business owners that misrepresented (or represented with reckless disregard for the truth) the Fraudulent Testers' ADA injury and standing, their own settlement authority, and the amount of attorney fees incurred that became part of their settlement demand.[2] (Am. Compl. ¶¶ 52–112, 132–145.) Plaintiffs also allege that the scheme included the Wampler Defendants' mischaracterization of their payments to the Fraudulent Testers—which were plainly payments for services rendered—as expense reimbursements, thereby avoiding federal and state payroll taxes and federal reporting of non-employment income. (Am. Compl. ¶¶ 124–130.) Plaintiffs allege precisely the sort of "massive scheme" involving "out-of-court actions" in furtherance of fraudulent litigation activities that *Kim* contemplated could render litigation activities actionable under RICO. *See* 884 F.3d at 105.

The Wampler Defendants also discuss at length two out-of-Circuit district court cases with superficial similarities to this one, but both cases are readily distinguishable.

In *Ghandi v. Ehrlich*, Civil Action No. 1:19-cv-03511-SDG, 2020 WL 5633416, at *6–*7 (N.D. Ga. Sep. 21, 2020), the plaintiffs did not and could not "identify a single fraudulent statement, filing, or activity by Defendants . . . . Thus, Plaintiffs' claims center not on the filing of false or frivolous ADA lawsuits, but rather on filing so many (presumably) meritorious ones."

---

[2] Plaintiffs recognize that one case that the Wampler Defendants indirectly cite—*U.S. v. Pendergraft*, 297 F.3d 1198, 1205-08 (11th Cir. 2002)—could be read to suggest that demand letters are not actionable under RICO, even in a *criminal* case. But that case is distinguishable because there was active litigation pending at the time the demand letter was sent. *See id.* at 1205. More importantly, the Eleventh Circuit has subsequently dismissed *Pendergraft*'s analysis of this issue as "simply dicta" and expressly rejected its application to pre-litigation demands. *See Lee*, 427 F.3d at 889–91.

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 14

Here, by contrast, Plaintiffs allege that the Wampler Defendants and their Local Counsel sent thousands of demand letters and filed over a thousand cases with (at best) reckless disregard for the truth of their allegations of ADA injury and standing, and affirmatively misrepresented their clients' *in forma pauperis* status, the nature of the payments made to the Fraudulent Testers, their settlement authority, and the attorney fees they had incurred. (Am. Compl. ¶¶ 52–145.)

In *Abbondanza*, the court was ruling on a summary judgment motion—it had previously *denied* a motion to dismiss based on the same argument the Wampler Defendants advance here. *See* 2022 WL 889099, at *16. The court found that "the case now has passed the pleading stage, and Plaintiff no longer may rely on their allegations . . ." *Id*. The court found that there was "no evidence" that the series of ADA lawsuits brought by one of the defendants "were frivolous[.]" *Id*. Here, of course, the case is in a different posture: for purposes of the pending motion to dismiss, the Court must assume the truth of the facts alleged in the Amended Complaint.

**C.    Plaintiffs have alleged multiple predicate acts of wire fraud for purposes of their RICO claim.**

       **1.    Plaintiffs have alleged that Defendants' demand letters and complaints contained material misrepresentations.**

              **a.    The demand letters and complaints misrepresent the Fraudulent Testers' injury and standing.**

The Wampler Defendants advance four arguments that Plaintiffs fail to allege actionable misrepresentations regarding the Fraudulent Testers' alleged ADA injuries and standing to file suit. Each of those arguments fails.

First, the Wampler Defendants argue that any misrepresentations in their demand letters and complaints regarding the Fraudulent Testers' standing are misrepresentations of *law*, and therefore not actionable as fraud. But the Wampler Defendants are playing word games. Whether the Fraudulent Testers had standing to file ADA claims depends on *facts*: namely, that the

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 15

Fraudulent Tester "encounter[ed] an accessibility barrier violating [the ADA's] provisions," and that he or she either "intends to return" to the noncompliant place of public accommodation or is "deterred" from doing so. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 947–50 (9th Cir. 2011). Plaintiffs allege that the Wampler Defendants and their Local Counsel made misrepresentations concerning those *facts*. (Am. Compl. ¶¶ 71–74.) This is not a case in which the Wampler Defendants misrepresented *the law* with respect to standing by, for example, misstating the elements that the Fraudulent Testers were required to satisfy. This is a case in which the Wampler Defendants misrepresented the *facts* on which standing is based.

Second, the Wampler Defendants argue that they accurately represented that the Fraudulent Testers had standing under the "deterrent effect" doctrine based on nothing more than their mere visits to noncompliant properties. Simply put, that is *not* the law. First, an ADA plaintiff must *actually encounter or become aware of* an ADA violation that "affects the plaintiff's full and equal enjoyment of the facility *on account of his particular disability*." *Chapman*, 631 F.3d at 947 (emphasis added). While an ADA plaintiff may then challenge *other* barriers at the same property that he or she did not "personally encounter[ ]," those barriers, too, must be "related to his or her specific disability." *Id*. at 950–51 (citation omitted). In addition, an ADA plaintiff must establish either an intent to return to the property or that he or she is deterred from doing so. *Id*. at 949. Here, Plaintiffs allege that the Wampler Defendants asserted those facts with reckless disregard for their truth. Rather than making any effort to ascertain the truth of those factual assertions, the Wampler Defendants simply sent the Fraudulent Testers to properties they already believed to be noncompliant, without even inquiring whether the Fraudulent Testers actually encountered any barriers to access, much less one related to their specific disabilities, or whether the properties even remained noncompliant. (Am. Compl. ¶¶ 49–

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 16

51, 60–68.) Nor did the Wampler Defendants even bother to inquire whether the Fraudulent Testers intended to return to the properties or would be deterred from doing so on account of any ADA violation. (Am. Compl. ¶¶ 94–112.) The Wampler Defendants had no reasonable basis for asserting the facts underlying ADA standing—in fact, they *actively avoided* learning those facts, as attempting to do so would disrupt the high-volume pipeline on which their scheme depended.

Third, the Wampler Defendants argue that even if the demand letters contained "technical inaccuracies," those misstatements were not "material," and therefore were not actionable. That is absurd. Plaintiffs would have no incentive to settle or otherwise engage with purported claimants who had no standing to sue them. Plaintiffs specifically allege that, based on the Wampler Defendants' and their Local Counsel's misrepresentations, they entered into settlements, incurred litigation expenses, and/or undertook costly (and potentially unnecessary) alterations to their properties, and therefore suffered damages. (Am. Compl. ¶¶ 138–143, 146–153, 188–191.)

Fourth, the Wampler Defendants argue that Plaintiffs have not alleged the specific intent to defraud that is required for a wire fraud claim. But it is well-established that a statement is false or fraudulent within the meaning of the wire fraud statute not only if it is knowingly false, but also if it is "made *with reckless indifference* as to its truth or falsity . . . ." *U.S. v. Lloyd*, 807 F.3d 1128, 1164 (9th Cir. 2015) (quoting *U.S. v. Love*, 535 F.2d 1152, 1157 (9th Cir. 1976)) (emphasis added in *Lloyd*). Plaintiffs clearly allege that the Wampler Defendants made their representations concerning the facts underlying the Fraudulent Testers' alleged ADA standing with reckless indifference to their truth. (Am. Compl. ¶¶ 49–51, 60–68, 94–112.)

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 17

**b.    The demand letters misrepresent Defendants' settlement authority and actual attorney fees incurred.**

Next, the Wampler Defendants argue that the allegations concerning Local Counsel's lack of settlement authority "are not leveled against" them, but only against Local Counsel. That argument simply ignores the actual allegations of the Amended Complaint. Plaintiffs allege that the demand letters sent by Local Counsel (and the draft complaints that accompanied them) were the product of a "mail merge" performed from a template prepared by the Wampler Defendants. (Am. Compl. ¶¶ 69–70.) Plaintiffs specifically allege that the Wampler Defendants' agreements with Local Counsel tasked Local Counsel with conducting the settlement negotiations with the property owner, with the proceeds of the settlement to be split 70% to the Wampler Defendants and 30% to Local Counsel. (Am. Compl. ¶ 57.) The Wampler Defendants also directly entered into the representation agreements with the Fraudulent Testers that authorized them to "act as a negotiator" in settlement negotiations, which they wrongfully interpreted to give them (and, by extension, Local Counsel) blanket authorization to settle cases on the Fraudulent Testers' behalf without meaningful consultation. (Am. Compl. ¶¶ 132–134.) The Wampler Defendants were thus the orchestrator and central link between the purported blanket grant of settlement authority and the settlement discussions between Local Counsel and the property owners.

The Wampler Defendants also argue that Plaintiffs fail to allege a "pattern" of racketeering activity with respect to the lack of settlement authority because they only specifically discuss the AB Hollywood case. Again, the Wampler Defendants willfully ignore the other allegations of the Amended Complaint, which make clear that the specific misrepresentations to AB Hollywood were but one instance of a pattern directed toward property owners generally, all based on the Wampler Defendants' uniform co-counsel agreements with Local Counsel and uniform representation agreements with the Fraudulent Testers. (Am. Compl.

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 18

¶¶ 57, 132–135.) The Wampler Defendants also ignore Plaintiffs' allegations that each of the named Plaintiffs received similar demand letters, all making similar settlement demands without authority, and all also making related misrepresentations concerning demands for payment of attorney fees that had not actually been incurred—all at the direction of the Wampler Defendants. (Am. Compl. ¶¶ 136–143.)

**2.      Plaintiffs plead their RICO claim with sufficient particularity under Rule 9(b).**

The Wampler Defendants further argue that Plaintiffs fail to plead the predicate acts of wire fraud with the particularity required by Rule 9(b). But Plaintiffs could hardly have been more specific as to the misrepresentations directed to each of them. Each named Plaintiff alleges that it received a demand letter from Local Counsel (at the Wampler Defendants' behest) on a particular date, making settlement demands without authority and demanding payment of attorney fees that had not actually been incurred and, if the demand was not met, had a lawsuit filed against it. (Am. Compl. ¶¶ 69–70, 132–143, 147–149.) Plaintiffs also allege that "[e]very single complaint" accompanying a demand letter or in final filed form—including the demand letters sent to and complaints filed against the named Plaintiffs—contained specific misrepresentations regarding the Fraudulent Testers' alleged ADA injuries and standing. (Am. Compl. ¶¶ 71–76.)

While Plaintiffs allege that thousands of *other* property owners (and members of the putative class) were victims of similar (indeed, virtually identical) conduct by the Wampler Defendants (Am. Compl. ¶ 59), Plaintiffs need not, and at this stage cannot, allege all of the details of each and every one of those transactions. "Rule 9(b) does not require a plaintiff in a consumer class action to identify every encounter with precision . . . . Rule 9(b) merely requires enough particularity to allow the defendants to understand the fraudulent action they are alleged

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT- 19

to have engaged in." *Underwood v. Future Income Payments, LLC*, Case No. SA CV 17-1570-DOC (DFMx), 2018 WL 4964333, at \*6 (C.D. Cal. Apr. 26, 2018). Plaintiffs readily satisfy that standard, alleging a uniform pattern and course of conduct by the Wampler Defendants of directing demand letters and filing complaints containing specific misrepresentations concerning the Fraudulent Testers' ADA injuries and standing, their own settlement authority, and the attorney fees they allegedly incurred. (Am. Compl. ¶¶ 52–76, 132–145.) The precise additional details of when, and to whom, each demand letter was sent are in the Wampler Defendants' possession and uniquely available to them. Rule 9(b)'s particularity requirement is relaxed in instances of corporate fraud where the supporting facts are exclusively within the defendants' possession. *See, e.g.*, *Deutsch v. Flannery*, 823 F.2d 136,1 1366 (9th Cir. 1987); *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1106 (C.D. Cal. 2006).

**D.** **Plaintiffs' RICO claim is not barred by the *Noerr-Pennington* doctrine because it falls within the "sham litigation" exception.**

Plaintiffs do not dispute that Defendants' litigation-related activities would be subject to the *Noerr-Pennington* doctrine if they did not fall within the "sham litigation" exception. *See Sosa*, 437 F.3d at 932–38. A claim arising out of litigation activity falls under the "sham litigation" exception if (1) the lawsuit is objectively baseless and the defendant's motive in bringing it is unlawful; (2) the conduct involved a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; or (3) the allegedly unlawful conduct consists of making intentional misrepresentations to the court that deprive the litigation of its legitimacy. *Id*. at 938. Here, Plaintiffs' allegations are sufficient to invoke any one of those three exceptions.

First, and most obviously, Plaintiffs allege that Defendants brought a series of lawsuits pursuant to a policy of starting legal proceedings without regard to their merits and for an

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 20

unlawful purpose. As alleged in the Amended Complaint, the Wampler Defendants created a system in which they would pay Fraudulent Testers $200 to visit pre-selected properties, purchase a small item or otherwise obtain proof of their visit, and upload a photo—without ever inquiring whether the Fraudulent Testers encountered any barrier related to their particular disabilities or whether they intended to visit (or were deterred from visiting) the establishment again. (Am. Compl. ¶¶ 45–51, 60–68, 77–112.) The Wampler Defendants and their Local Counsel would then send demand letters to and file complaints against the establishments based on allegations concerning the Fraudulent Testers' ADA injuries and standing that were knowingly false or, at the very least, were made with reckless disregard for their truth or falsity. (Am. Compl. ¶¶ 52–59, 69–76, 109–111.) Plaintiffs allege that the Wampler Defendants and their Local Counsel sent over 4,000 demand letters and filed over a thousand lawsuits pursuant to this scheme. (Am. Compl. ¶ 59.) Those demand letters and lawsuits were sent and filed for the unlawful purpose of extracting settlement payments for attorney fees that the Wampler Defendants and their Local Counsel misrepresented they had (but in fact had not) incurred, that were obtained without their clients' knowledge or informed consent, and that they were not entitled to anyway in the absence of their clients' ADA injuries and standing. (Am. Compl. ¶¶ 57–58, 132–145.) The Wampler Defendants "reckless conduct[,]" as well as their deliberate and knowing "wrongdoing, fraud or misconduct[,]" amounts to bad faith that is sufficient to show an unlawful propose. *See Ameritox, Ltd. v. Aegis Servs. Corp.*, No. 07-80498-CIV, 2008 WL 2705435, at *4 (S.D. Fla. Jul. 9, 2008).

Second, even at the individual lawsuit (or threatened lawsuit) level, Defendants' claims were objectively baseless and brought (or threatened) with an unlawful motive. As discussed above, the Wampler Defendants and their Local Counsel asserted claims that were objectively

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 21

baseless because they were made either with actual knowledge that their allegations regarding the Fraudulent Testers' ADA injuries and standing were false or, at the very least, with reckless indifference to their truth. "[R]eckless indifference to the law" qualifies as "objective bad faith" and renders the claims brought "objectively unreasonable and vexatious." *Cf. Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006) (applying 28 U.S.C. § 1927). The U.S Constitution's Petition Clause—out of which the *Noerr-Pennington* doctrine arises—does not protect petitions containing "intentional and reckless falsehoods." *McDonald v. Smith*, 472 U.S. 479, 484 (1985). And, as discussed above, each lawsuit or threatened lawsuit was brought or threatened with the unlawful motive of extracting settlement payments consisting of attorney fees that had not actually been incurred, that the Wampler Defendants and their Local Counsel lacked client authority to demand, and to which they were not entitled in any event.

Third, Plaintiffs allege that Defendants' lawsuits and threatened lawsuits involved intentional misrepresentations to the court that deprived the litigation of its legitimacy. By filing complaints alleging the Fraudulent Testers' ADA injuries and standing, the Wampler Defendants and their Local Counsel certified to the court that the factual contentions underlying those allegations had evidentiary support. *See* Fed. R. Civ. P. 11(b)(3). That certification was false, as the Wampler Defendants and their Local Counsel had no idea whether the Fraudulent Testers had actually encountered any barrier to their use and enjoyment of the property or had any intent to return (or were deterred from returning) to the property in the future. In *Saniefar v. Moore*, Case No. 1:17-cv-00823-LJO-BAM, 2017 WL 5972747, at *6 (E.D. Cal. Dec. 1, 2017)—a case strikingly similar to this one—the court held that similar intentional misstatements[3] regarding an

---

[3] Reckless indifference to the truth or falsity of a statement is equivalent to actual knowledge of its falsity. *See, e.g.*, *U.S. v. Schaffer*, 600 F.2d 1120, 1121-22 (5th Cir. 1979); *Bishop v. E.A. Strout Realty Agency*, 182 F.2d 503, 505 (4th Cir. 1950).

PLAINTIFFS' RESPONSE TO WAMPLER DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT- 22

ADA plaintiff's alleged injury and standing were material, and thus fell within the third "sham litigation" exception, because, "[i]f [the ADA claimant's] standing was fabricated in these ADA actions, so was the courts' jurisdiction." Moreover, in many instances, the Wampler Defendants and their Local Counsel knowingly filed perjurious *in forma pauperis* applications on behalf of the Fraudulent Testers that failed to disclose the income they received from the Wampler Defendants for visiting the properties. (Am. Compl. ¶¶ 113–123.)

Thus, under any of the three iterations of the "sham litigation" exception, Plaintiffs' claims are not barred by the *Noerr-Pennington* doctrine.

## IV. CONCLUSION

For the foregoing reasons, the Wampler Defendants' motion to dismiss should be denied.

DATED: July 30, 2026

**ANGELI & CALFO LLC**

By: s/ Peter D. Hawkes
    PETER D. HAWKES, OSB No. 071986
    peter@angelicalfo.com
    TYLER P. FRANCIS, OSB No. 162519
    tylerf@angelicalfo.com
    121 SW Morrison Street, Suite 400
    Portland, OR 97204
    Telephone: (503) 954-2232
    Facsimile: (503) 227-0880

    *Of Attorneys for Plaintiffs*