**PETER D. HAWKES,** OSB No. 071986
peter@angelicalfo.com
**TYLER P. FRANCIS,** OSB No. 162519
tylerf@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Of Attorneys for Plaintiffs Baek Family
Partnership, LLC, AB Hollywood, LLC,
Abraham Lee 4511, LLC, and The Penney
Kim Trust, on behalf of themselves and all
others similarly situated*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| BAEK FAMILY PARTNERSHIP, LLC, an Oregon limited liability company; AB HOLLYWOOD, LLC, an Oregon limited liability company; ABRAHAM LEE 4511, LLC, an Oregon limited liability company; and THE PENNEY KIM TRUST, by and through its Trustee, PENNEY KIM; on behalf of themselves and all others similarly situated, | Case No. 25-cv-00584-AN<br><br>PLAINTIFFS' RESPONSE TO DEFENDANT JESSICA MOLLIGAN'S MOTION TO DISMISS AMENDED COMPLAINT<br><br>REQUEST FOR ORAL ARGUMENT |
| Plaintiffs, | |
| v. | |
| WAMPLER, CARROLL, WILSON & SANDERSON, P.L.L.C., a Tennessee professional corporation; J. LUKE SANDERSON, an individual; B.J. WADE, an individual; JESSICA MOLLIGAN, an individual; CONNER SLEVIN, an individual; and JOHN DOES 1 – 100, | |
| Defendants. | |

## INTRODUCTION

In a startling display of chutzpah[1], Defendant Jessica Molligan attempts to spin her near-complete abdication of her professional responsibilities to her clients and to the Court into a "get out of jail free" card on the RICO claim Plaintiffs allege against her. Molligan argues that she was a mere legal services provider to the Wampler Defendants, and because they—not she, the attorney ostensibly in charge of the case—were responsible for investigating the facts and drafting the complaints containing fraudulent misrepresentations regarding her clients' ADA injuries and standing, she did not engage in the operation or management of, or exercise any direction or control over, the Wampler Defendants' racketeering enterprise. Molligan also argues that her status as a mere service provider means that she was not part of an "associated-in-fact" enterprise with the Wampler Defendants and lacked a "common purpose" with them. In addition to shocking the professional conscience, Molligan's arguments are legally incorrect.

First, Molligan plainly participated in the operation or management of the enterprise—indeed, she and the other Local Counsel working with the Wampler Defendants were absolutely *necessary* to its operation. Molligan may not have been running the show, but she need not have been in "upper management" to be held liable—she merely needed to have been operating at the direction of those who were, *i.e.*, the Wampler Defendants. Moreover, Molligan *did* exercise significant direction and control over her portion of the enterprise, with express responsibility for prosecuting fraudulent ADA cases in her jurisdiction and attempting to negotiate monetary

---

[1] *See, e.g.*, *Harbor Ins. Co. v. Schnabel Foundation Co.*, 946 F.2d 930, 937 & n.5 (D.C. Cir. 1991) ("the legal definition of chutzpah . . . is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan"); *Marks v. Commissioner*, 947 F.2d 983, 986 (D.C. Cir. 1991) ("chutzpah doctrine" invoked where fugitives from criminal prosecution argued that inadequate efforts were made to notify them of tax delinquency).

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 2

**ANGELI & CALFO LLC**
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810

settlements. Molligan was not simply performing incidental legal services for a RICO enterprise—the legal services *were* the enterprise's scheme.

Second, Molligan clearly had a "common purpose" with the Wampler Defendants sufficient to form an associated-in-fact enterprise—namely, the improper purpose of extracting settlement payments from property owners through threats and prosecution of fraudulent ADA lawsuits. Molligan's and the Wampler Defendants' purposes were entirely aligned—they had agreed to a split of the proceeds of the fraudulent scheme. The fact that their relationship was contractual—although, to say the least, it was a very *unusual* contract—does not mean that they could not be acting with a "common purpose."

Finally, Molligan ignores the fact that, even if she prevails on either of her arguments, she could still be held liable as a co-conspirator in the RICO enterprise under 18 U.S.C. § 1962(d) because the Amended Complaint's allegations establish that she knew about and agreed to facilitate the Wampler Defendants' scheme. That is all that is required to prove liability for conspiracy under RICO. For that reason, too, her motion to dismiss should be denied.

## STATEMENT OF FACTS

The following facts are alleged in Plaintiffs' Amended Complaint and therefore must be assumed to be true for purposes of this motion. *See Pettibone v. Russell*, 59 F.4th 339, 450 (9th Cir. 2023).

I. **The Wampler Defendants, their Local Counsel, and the Fraudulent Testers form a racketeering enterprise to fraudulently induce settlement payments for purported ADA claims from unsuspecting property owners.**

Defendants Wampler, Carroll, Wilson & Sanderson, P.L.L.C., J. Luke Sanderson, and B.J. Wade (the "Wampler Defendants"), their clients (the "Fraudulent Testers"), and local counsel in various jurisdictions where their clients were located (the "Local Counsel") engaged

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 3

in a nationwide, highly lucrative scheme to pervert the intent and purpose of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. (the "ADA"), by turning it into a money-making machine for themselves through the assertion of thousands of bad-faith and fraudulent ADA claims. (Am. Compl. ¶¶ 1–13.)

First, the Wampler Defendants would recruit and pay their "clients"—the Fraudulent Testers—to visit business properties that they believed were (or at least *once* were) noncompliant with the ADA. (*Id*. ¶¶ 45–47, 77–93.) The Wampler Defendants specifically instructed the Fraudulent Testers not to concern themselves with actually encountering or observing any ADA violations, but merely to upload evidence of their visit to the property. (*Id*. ¶¶ 49–51.) The Wampler Defendants would pay the Fraudulent Testers $200 per property they visited, which they would mischaracterize as "expense reimbursements" (thus avoiding the need to report it as income) and often, if the matter wound up in litigation, would falsely omit from *in forma pauperis* applications submitted on the Fraudulent Testers' behalf. (*Id*. ¶¶ 47, 113–131.) The Wampler Defendants' system meant that they had no way of knowing if the Fraudulent Testers had actually suffered any ADA injury or had any intent to return to the property, which is a critical element of ADA standing. (*Id*. ¶¶ 62–68, 94–112.)

Next, the Wampler Defendants would have Local Counsel in the jurisdiction where the Fraudulent Tester and the subject property were located send a demand letter, accompanied by a draft complaint, to the property owner, using a mail merge process. (*Id*. ¶¶ 52, 69–70.) If the property owner failed to agree to a monetary settlement, Local Counsel was instructed to then file suit using the same complaint. (*Id*. ¶¶ 55–56.) The complaints were simply cut and pasted from a standard template generated by the Wampler Defendants, and each contained identical— and false—allegations regarding the alleged ADA injury and standing for which the Wampler

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 4

Defendants and Local Counsel had no reasonable basis. (*Id*. ¶¶ 53, 71–75.) The Wampler Defendants' standard form co-counsel agreement with Local Counsel explained that the entire purpose of the scheme was to "attempt to achieve a settlement" with the victim property owners (to be split between the Wampler Defendants and Local Counsel at 70% and 30%, respectively), with Local Counsel being the face of settlement negotiations but relying entirely on the Wampler Defendants to investigate the alleged ADA violations and to draft the complaints. (*Id*. ¶¶ 7, 56–57.)

Purporting to rely on their representation agreements with the Fraudulent Testers, Local Counsel and the Wampler Defendants would represent to property owners that they had full settlement authority and would even sign settlement agreements on the Fraudulent Testers' behalf without informing them of the details of the settlement, including the attorney fees they were recouping. (*Id*. ¶¶ 132–134.) The Wampler Defendants and Local Counsel would also misrepresent to property owners the actual attorney fees they had incurred, or would incur, in connection with the action in an effort to inflate their recovery. (*Id*. ¶ 136.)

## II.     Defendant Jessica Molligan, as Local Counsel for the Wampler Defendants, was an active and critical participant in the racketeering enterprise.

Defendant Molligan was one of the Local Counsel who worked with the Wampler Defendants and represented Fraudulent Testers, including Defendant Conner Slevin and Justin Burley-Beavers, in sending and filing a multitude of demand letters and lawsuits in Oregon, including with respect to each of the named Plaintiffs in this case. (*Id*. ¶¶ 3, 6–7, 21, 58, 119, 138, 142–143.)

As part of that arrangement, Molligan entered into a standard form "Co-Counsel Agreement" with the Wampler Defendants. (*See* Am. Compl. Ex. 1.) Pursuant to that agreement, the Wampler Defendants were "fully responsible for…the initial investigation of claims . . . ,

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 5

**ANGELI & CALFO LLC**
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810

including the confirmation of the existence of architectural barriers as defined currently by the ADA, or as may be established and/or amended by Federal Law. Based on that initial investigation, and solely at the determination of [Defendant] SANDERSON, [the Wampler Defendants] shall prepare an appropriate Complaint, as appropriate under the circumstances of the claim, and electronically transmit same to Local Counsel." (*Id*. at 2, § 2.) Molligan was then contractually required to "take all immediate steps to file the Complaint"—although the Co-Counsel Agreement was explicit that she "may not amend or revise the Complaint, without the prior written consent and consultation of" the Wampler Defendants. (*Id*. § 3.) Thereafter, Molligan had "the duty to prosecute the action, including conferring with counsel for the defendant property owner or the property owner, if unrepresented, in an attempt to achieve a settlement." (*Id*.) Molligan was entitled to 30% of any net settlement amount received, after the deduction of any expenses paid by the Wampler Defendants. (*Id*. at 2-3, § 4.) Molligan was also required to make a "weekly report" (or its equivalent) to the Wampler Defendants "of the status of all cases being handled on their behalf." (*Id*. at 2, § 3.) The agreement anticipated that Molligan "will be exposed to methods developed by [the Wampler Defendants] related to the retention and handling of ADA Title III claims" and required her to keep that information confidential. (*Id*. at 4, § 7.)

Molligan's actions in an ADA case brought against Plaintiff AB Hollywood, LLC ("AB Hollywood"), *Slevin v. AB Hollywood, LLC*, D. Or. Case No. 3:23-cv-01404-YY (the "*AB Hollywood* case"), have garnered significant attention both within and outside this Court. The facts provide a stark illustration of virtually every aspect of the Wampler racketeering scheme. Like other Fraudulent Testers, Defendant Slevin was paid $200 by the Wampler Defendants for visiting AB Hollywood's property, which the Wampler Defendants inaccurately characterized as

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 6

a "reimbursement"—an unethical arrangement of which Molligan was aware and in which she was complicit. (Am. Compl. ¶ 129.) Molligan, as Local Counsel working with the Wampler Defendants, send AB Hollywood a demand letter seeking $13,000 in attorney fees—an amount that "grossly overestimated" any work that had been or would be done prior to litigation—and later filed suit on Slevin's behalf. (Am. Compl. ¶¶ 137, 143.) Molligan admitted that the allegations of ADA violations against AB Hollywood were based on a purported "inspection report" provided to her by the Wampler Defendants. (*Id*. at 78.) But photographs taken by the Fraudulent Tester, Defendant Slevin, directly contradicted the allegations of specific ADA violations stated in the demand letter and the complaint. (*Id*. ¶ 76.) Molligan also admitted that she did not ask Slevin whether he had visited the property before or intended to return, even though she knew that was a key part of his alleged claim. (*Id*. ¶ 98.) Once news reports concerning the Wampler Defendants' scheme came out, Slevin withdrew any authority to pursue the case that he had previously provided to the Wampler Defendants or Molligan—but Molligan continued to prosecute and attempt to settle the case anyway. (*Id*. ¶¶ 85, 135.) The court found that the case against AB Hollywood was brought "in bad faith" without any meaningful investigation of the facts, and solely for the "improper purpose" of generating fees—*not* remediating any alleged ADA violations. (*Id*. ¶ 58.)

Plaintiff Baek Family Partnership, LLC ("Baek") also received a demand letter from Molligan on behalf of Slevin, which alleged ADA violations that were either nonsensical or simply cut and pasted from a form generated by the Wampler Defendants, and demanded a cash settlement under threat of litigation. (Am. Compl. ¶¶ 147–149, 175.) In response, Baek undertook unnecessary, costly, and disruptive alterations to its property in an effort to address the vague and/or nonexistent alleged violations. (*Id*. ¶¶ 150–153.) Like AB Hollywood, Baek was

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 7

later sued by Molligan on behalf of Slevin, and Baek incurred significant attorney fees defending that case before it was voluntarily dismissed as the Wampler racket began to unravel. (*Id*. ¶ 143.)

Plaintiff Abraham Lee 4511, LLC ("Abraham Lee 4511") received two separate demand letters—including one from Molligan—on behalf of Fraudulent Tester Justin Burley-Beavers and, when he did not accede to that demand, Molligan filed suit, resulting in the expenditure of attorney fees and, ultimately, a settlement agreement. (Am. Compl. ¶ 142.) Molligan subsequently filed a lawsuit in state court to collect the settlement payment, causing Abraham Lee 4511 to incur additional attorney fees—but when Abraham Lee 4511 sought discovery from Burley-Beavers, Molligan dismissed the lawsuit. (*Id*.) Abraham Lee 4511 alleges that the settlement agreement was the product of deception and coercion based on meritless claims made without any knowledge concerning the existence of an actionable ADA injury or standing. (*Id*. ¶ 190.)

Plaintiff the Penney Kim Trust, by and through its Trustee, Penney Kim ("Penney Kim Trust") likewise received a demand letter from Molligan on behalf of Slevin containing materially false allegations concerning Slevin's ADA injury and standing and demanding payment of attorney fees far in excess of those Molligan had actually incurred in preparing demand letters using the Wampler Defendants' template complaint. (Am. Compl. ¶ 138.) As a result of Molligan's demand letters, Penney Kim Trust paid thousands of dollars in settlement, which it would not have done had it known of the fabricated claims of ADA injury or Molligan's lack of actual settlement authority. (*Id*. ¶¶ 140–141, 177, 190.)

## ARGUMENT

Plaintiffs incorporate by reference their Response to the Wampler Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, as Defendant Molligan has adopted by reference the

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 8

arguments presented in that motion. Plaintiffs respond to Defendant Molligan's additional arguments below.

**I.      Plaintiffs allege Defendant Molligan participated in operation or management of the Wampler racketeering enterprise.**

Molligan argues that she was simply one of many Local Counsel who occasionally provided legal services to the Wampler Defendants' enterprise, and that she therefore did not participate in the "operation or management" of the enterprise for purposes of liability under 18 U.S.C. § 1962(c). But, as alleged in the Amended Complaint, Molligan was not simply a run-of-the-mill lawyer performing routine legal services. She and the other Local Counsel were a crucial part of the racketeering scheme, responsible for, among other things, prosecuting the fraudulent ADA claims and attempting to negotiate settlements with the victim property owners—with the profits of the unlawful enterprise to be split between themselves and the Wampler Defendants. The scheme simply could not have worked without their participation.

As *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993), makes clear, "operation or management" of a RICO enterprise does not require the ability to direct or control the enterprise *as a whole*, or even in significant part. "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* That is the case here. Under the Co-Counsel Agreement, Molligan was required to "take all immediate steps to file [a] Complaint" that had been prepared by the Wampler Defendants "upon receipt[.]" (Am. Compl. Ex. 1 at 2, § 3.) Molligan was prohibited from amending or revising the complaint without the Wampler Defendants' consent. (*Id.*) She was also required to "make a weekly written report" (or its functional equivalent) to the Wampler Defendants "of the status of all cases being handled on their behalf." (*Id.*) Thus Molligan was clearly acting "under the direction" of the Wampler Defendants. At the same time,

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 9

however, Molligan exercised *some* measure of direction and control: after the filing of the complaint, she had "the duty to prosecute the action, including conferring with counsel for the defendant property owner or the property owner, if unrepresented, in an attempt to achieve a settlement." (*Id.*) "[A]chiev[ing] a settlement" based on fraudulently alleged ADA claims was, of course, the entire purpose of the enterprise. (Am. Compl. ¶¶ 7, 57.) That Molligan had *some* control over achieving that objective is enough; there is no requirement that she have had "*significant control* over or within [the] enterprise." *Reves*, 507 U.S. at 179 n. 4 (citation omitted; emphasis added in *Reves*).

That Molligan's role in the scheme involved the rendition of legal services does not absolve her of liability for "operation or management" of the scheme. As the Eighth Circuit has explained:

> Appreciation for the unremarkable notion that the operation or management test does not reach persons who perform routine services for an enterprise **should not, however, be mistaken for an absolute edict that an attorney who associates with an enterprise can never be liable under RICO. An attorney's license is not an invitation to engage in racketeering**, and a lawyer no less than anyone else is bound by generally applicable legislative enactments. Neither *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions, and the fact that a defendant has the good fortune to possess the title "attorney at law" is, standing alone, completely irrelevant to the analysis dictated by the Supreme Court. It is a good thing, we are sure, that we find it extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney). This result, however, is not compelled by the fact that the person happens to be a lawyer, but for the reason that these actions do not entail the operation or management of an enterprise. Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and **we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the**

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 10

**enterprise**. The polestar is the activity in question, not the defendant's status.

*Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) (footnote omitted; emphasis added). In

*Handeen*, the court found allegations that a law firm may have suggested the use of a bankruptcy

proceeding to help their client avoid payment of a judgment against him, "navigated the estate

through the bankruptcy system[,]" directed the creation of false promissory notes and other sham

debts, defended those fraudulent claims against objections, prepared "filings and schedules

containing erroneous information," "formulated and promoted fraudulent payment plans," and

"participated in devising a scheme to conceal [their client's] new job from the bankruptcy

trustee" amounted to "making important decisions concerning the operation of the enterprise"

sufficient to state a claim against the law firm under Section 1962(c). *Id*. at 1350.

This is *not* a case where the rendition of routine legal services was merely incidental or

collateral to the racketeering enterprise, as in some of the cases Molligan cites. *See Walter v.*

*Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (attorney did not "knowingly implement[ ]

decisions of upper management" and "was not indispensable to achievement of the enterprise's

goal"); *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (attorney did not become involved

until late in the scheme and his role "was at best sporadic"; attorney "did not play any part in

directing the affairs of the enterprise"). Rather, this case is much closer to *Handeen* and another

case Molligan cites (although notably, without discussing its facts or outcome): *Columbia*

*Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 428 F. Supp. 3d 354, 375-76 (D.

Or. 2019), *reconsid. granted on other grounds*, 454 F. Supp. 3d 1040 (D. Or. 2020). As in

*Handeen*, "[t]he fraudulent scheme alleged [in *Columbia Sportswear*] was a *legal* scheme

involving the filing of fraudulent petitions" and "concealing the entire scheme" from the plaintiff

and the federal district court. *Id*. at 376 (emphasis in original). The court found that the

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 11

attorney's alleged participation in that scheme, including his alleged responsibility for "litigation management and strategy[,]" was sufficient to state a RICO claim against him. *Id.*

The fraudulent scheme in this case was likewise "a *legal* scheme" in which Molligan played a significant and indispensable part. As out-of-state attorneys, the Wampler Defendants simply could not enact their scheme at a nationwide scale (*see* Am. Compl. ¶¶ 13, 43) without the participation and assistance of Local Counsel like Molligan. As part of that scheme, Molligan had a significant role in "litigation management and strategy": she was responsible for prosecuting fraudulent ADA claims in an effort to navigate them towards a monetary settlement and was directly responsible for those settlement negotiations. (Am. Compl. Ex. 1 at 2, § 3.) At least in the *AB Hollywood* case, Molligan appears to have acted entirely on her own in accepting a settlement offer, without consulting either the Wampler Defendants or her own client. (Am. Compl. ¶ 135.) And while she self-servingly characterizes her role as "sporadic," the Co-Counsel Agreement clearly contemplates that she would be on the receiving end of an ongoing pipeline of cases (*see* Am. Compl. Ex. 1 at 2, § 3 (requiring a "weekly report" on "the status of all cases being handled on [the Wampler Defendants'] behalf")), and it can hardly be a coincidence that she served as Local Counsel on *every single one* of the fraudulent claims asserted against the named Plaintiffs. (Am. Compl. ¶¶ 138, 142-143.) Plaintiffs further allege that Molligan represented one Fraudulent Tester in "more than a dozen" cases filed over a six-month period beginning in February 2024. (*Id.* ¶ 119.)

In short, Plaintiffs more than sufficiently allege that Molligan participated in the operation or management of the Wampler racketeering enterprise.

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 12

**ANGELI & CALFO LLC**
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810

**II.    Plaintiffs allege Defendant Molligan was part of an associated-in-fact enterprise.**

Next, Molligan argues that Plaintiffs have not alleged that she was part of an "associated in fact" enterprise because they do not allege she and the Wampler Defendants were acting with a "common purpose." But Plaintiffs could not possibly have alleged the "common purpose" of the Wampler Defendants and their Local Counsel, including Molligan, more clearly.

As Plaintiffs allege, "The ultimate purpose of the scheme was, of course, to generate settlement payments from the victim property owners, which the Wampler Defendants would then split with Local Counsel." (Am. Compl. ¶ 57.) This Court expressly found Molligan herself brought the lawsuit against AB Hollywood for that "improper purpose[.]" (*Id.* ¶ 58.) Plaintiffs allege that she acted with the same improper purpose when she sent demand letters and/or filed lawsuits against Plaintiffs Baek and Penney Kim Trust. (*Id.* ¶¶ 175, 177.) And that common purpose is spelled out right in the Co-Counsel Agreement: Local Counsel's sole duty after filing the complaint provided by the Wampler Defendants is "to prosecute the action, including conferring with counsel for the defendant property owner or the property owner, if unrepresented, *in an attempt to achieve a settlement*." (Am. Compl. Ex. 1 at 2, § 3 (emphasis added).) Local Counsel's sole compensation for their participation in the scheme was a 30% share of the "net settlement amount received on any file referred to Local Counsel." (*Id.* § 4.)

Molligan attempts to cast her relationship with the Wampler Defendants as a mere "servicing contract," an "arms-length" and "routine contractual relationship" where each party is pursuing their "own independent economic interests[.]" But no attorney could look at the Co-Counsel Agreement and consider it anywhere close to "routine." The Co-Counsel Agreement *expressly requires Molligan to abdicate her ethical duties* by relying entirely on the Wampler Defendants for investigation of the underlying claims and drafting the complaint, which she is

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 13

**ANGELI & CALFO LLC**
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810

required to file "immediate[ly]" and is *prohibited* from modifying in any way without their permission. (Am. Compl. Ex. 1 at 2, §§ 2-3.) Those terms render it impossible for Molligan to "reasonably inquire into and assess the facts and circumstances of each representation to determine whether the lawyer may accept or continue the representation" (ORPC 1.16(a)); to "exercise independent professional judgment and render candid advice" to her clients (ORPC 2.1); to determine whether "there is a basis in law and fact" for bringing the claims "that is not frivolous" (ORPC 3.1); or to determine whether, in filing the complaint, she is "mak[ing] a false statement of fact or law to [the] tribunal" (ORPC 3.3(a)(1)).

Moreover, the Co-Counsel Agreement contemplates that she "will be exposed to methods developed by [the Wampler Defendants] related to the retention and handling of ADA Title III claims" and requires her to keep that information confidential. (Am. Compl. Ex. 1 at 4, § 7.) As detailed in the Amended Complaint, those "methods," which included paying their clients to generate claims, mischaracterizing and lying about those payments, making boilerplate assertions of ADA injury and standing without any factual investigation, and settling cases without client authority using made-up attorney fee numbers (*see generally* Am. Compl. ¶¶ 43-145), were entirely fraudulent and unethical. Molligan certainly was "exposed" to those "methods": as this Court found in the *AB Hollywood* case, she was "complicit" in the Wampler Defendants' improper payments to their clients (Am. Compl. ¶ 129); she filed the ADA claim against AB Hollywood containing false allegations without conducting any factual investigation (*id*. ¶¶ 76, 98); she attempted to settle the case without client authority (*id*. ¶ 135); and she demanded payment of attorney fees that she could not possibly have actually incurred (*id*. ¶ 137).

Nor can Molligan plausibly contend that she and the Wampler Defendants were merely pursuing their "own independent economic interests." On the contrary, the economic interests

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 14

ANGELI & CALFO LLC
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810

*were entirely dependent on one another*—their arrangement was literally to split the proceeds generated by the fraudulent scheme. (Am. Compl. Ex. 1 at 2, § 4.) That the parties' relationship was contractual is neither here nor there: In *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005), the Ninth Circuit had no difficulty concluding that a law firm and its client—whose relationship is, obviously, a contractual relationship for legal services—could be separate participants of an associated-in-fact RICO enterprise.

Finally, Molligan's argument that alleging a "common purpose" requires allegations of a "structured decision-making process" and "mechanisms for controlling and directing the affairs of the group on an on-going basis rather than an ad hoc basis" misstates the law. Those elements—which were actually requirements for alleging an ongoing and continuous "enterprise," not a "common purpose"—have since been expressly abandoned by the Ninth Circuit. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) ("We take this opportunity to join the circuits that hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise . . . . To the extent that our past precedent suggests the contrary, it is hereby overruled."). Regardless, the clearly defined decision-making structure and division of labor in handling an ongoing series of cases that is set out in the Co-Counsel Agreement (Am. Compl. Ex. 1 at 2, §§ 2–3) would clearly satisfy those elements, even if they *were* required.

### III. Plaintiffs allege Defendant Molligan conspired with the Wampler Defendants in their operation of the Wampler racketeering enterprise.

Even if the Court were to conclude that Plaintiffs had failed to allege Molligan's liability as a participant in the RICO enterprise under Section 1962(c)—and it should not, for the reasons just explained—it would still have to deny Molligan's motion to dismiss because Plaintiffs allege that she conspired with the Wampler Defendants in *their* commission of RICO violations and is

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 15

therefore liable under 18 U.S.C. § 1962(d). (*See* Am. Compl. ¶¶ 161.f., 174.) To be liable for conspiracy under RICO, there is no requirement "that the defendant have actually conspired to operate or manage the enterprise herself." *U.S. v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *see also, e.g.*, *U.S. v. Rosenthal*, 805 F.3d 523, 532 (5th Cir. 2015) ("the *Reves* 'operation and management' test does not apply to *conspiracy* to commit a RICO offense under § 1962(d).") (emphasis in original). "It suffices that a defendant 'adopt[s] the goal of furthering or facilitating the criminal endeavor'." *Rosenthal*, 805 F.3d at 532 (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)). "The elements of a conspiracy under § 1962(d) are simply (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the *overall objective* of the RICO offense." *Samuelson v. Jewell Sch. Dist. 8*, 725 F. Supp. 3d 1196, 1208 (D. Or. 2024) (citation omitted; emphasis in original). "The 'key question' in a RICO conspiracy case is whether the defendant 'knew about and agreed to facilitate' a scheme that would involve the commission of two predicate acts." *Id*. (quoting *United States v. Fiander*, 547 F.3d 1036, 1041 (9th Cir. 2008)); *see also Fernandez*, 388 F.3d at 1230 ("a defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed that she 'knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise.'") (citation omitted).

Here, the Amended Complaint is replete with allegations that Local Counsel generally, and Molligan in particular, knew about and agreed to facilitate the Wampler racketeering scheme. (*See* Am. Compl. ¶¶ 3–4, 6–7, 9, 12, 52–58, 69–76, 78, 85, 94–123, 129, 132–143, 147–149.) That is sufficient to state a claim against Molligan under Section 1962(d), regardless of whether she can also be held liable under Section 1962(c).

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 16

**CONCLUSION**

For the foregoing reasons, Defendant Molligan's motion to dismiss should be denied.


DATED: July 30, 2026

**ANGELI & CALFO LLC**

By: s/ Peter D. Hawkes
    PETER D. HAWKES, OSB No. 071986
    peter@angelicalfo.com
    TYLER P. FRANCIS, OSB No. 162519
    tylerf@angelicalfo.com
    121 SW Morrison Street, Suite 400
    Portland, OR 97204
    Telephone: (503) 954-2232
    Facsimile: (503) 227-0880

    *Of Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE TO DEFENDANT
JESSICA MOLLIGAN'S MOTION TO DISMISS
AMENDED COMPLAINT - 17

**ANGELI & CALFO LLC**
701 PIKE STREET STE 1625
SEATTLE, WASHINGTON 98101
TEL +1.206.703.4810